**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| ALEX KEDAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19-2113-CSB-EIL |
| | ) |
| ILLINOIS DEPARTMENT OF | ) |
| TRANSPORTATION, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant, Illinois Department of Transportation (IDOT), by and through its counsel, Kwame Raoul, Attorney General for the State of Illinois, and in support of its Motion for Summary Judgment, states as follows:

### I.     INTRODUCTION

On August 12, 2019, Plaintiff filed his Complaint pursuant to 42 U.S.C. 2000e-3(a) claiming Defendant retaliated against him during his employment at IDOT following his filing of a complaint he filed alleging gender discrimination in April 2016. Defendant is entitled to summary judgment because the undisputed facts taken in the light most favorable to Plaintiff show that he did not suffer an adverse employment action and Defendant did not retaliate against him.

### II.    UNDISPUTED MATERIAL FACTS

1.     Plaintiff, Alex Kedas, was employed by IDOT for 32 years beginning in 1990. (Ex. 1, Kedas Dep. at 6).

2.     Beginning at IDOT in 1990, Plaintiff was an Inspector, Assistant Resident Engineer, Resident engineer CE (Civil Engineer) III, and subsequently a Senior Resident Engineer. (Ex. 1, Kedas Dep. at 7-8).

3. Plaintiff has a Bachelor of Science in civil engineering. (Ex. 1, Kedas Dep. at 7).

4. Plaintiff was a Senior Resident Engineer from April 1998 until March 2021. (Ex. 1, Kedas Dep. at 8).

5. Plaintiff separated work with IDOT in March 2021. (Ex. 1, Kedas Dep. at 9).

6. IDOT did not fire Plaintiff. (Ex. 1, Kedas Dep. at 9).

7. When Plaintiff left IDOT, he became self-employed as an engineering consultant. (Ex. 1, Kedas Dep. at 10).

8. Plaintiff currently operates his engineering consultant firm, with the last project in August 2021. (Ex. 1, Kedas Dep. at 10-11).

9. Plaintiff still maintains his professional engineering license, taking continuing education courses and paying a yearly fee. (Ex. 1, Kedas Dep. at 11-12).

10. As Senior Resident Engineer, Plaintiff's responsibilities included overseeing interstate highway and bridge construction, ensuring quality construction, enforcing contract specifications, ensuring payment to the contractor, material inspection, surveying, layout, and coordinating among several agencies. (Ex. 1, Kedas Dep. at 13-14).

11. Jason Smith (Smith) became the acting Supervising Construction Field Engineer (Civil Engineer V) with IDOT in December 2015 and assumed the position full-time in January 2017. (Ex. 2, Smith Dep. at 8-9; Ex. 5, Smith Declaration at 1).

12. In March 2016, Smith became Plaintiff's immediate supervisor. (Ex. 1, Kedas Dep. at 15; Ex. 5; Ex. 2, Smith Dep., at 61).

13. Smith was responsible for assigning projects to Plaintiff. (Ex. 2, Smith Dep. at 85).

14. Smith does not have the authority to hire, terminate, or promote employees. (Ex. 5, Smith Declaration at ¶ 11).

15. Smith only has the ability to recommend discipline to personnel staff. (Ex. 5, Smith Declaration at ¶ 12).

16. Plaintiff's job description allowed him to manage projects with a value range of $2 million to $25 million. (Ex. 1, Kedas Dep. at 16-17).

17. Up until 2018, the Senior Resident Engineer job description afforded the employee one project and $2 million worth of work. It was revised after 2018 and was then based on district program. (Ex. 5, Smith Declaration at ¶ 7).

18. Under Smith's supervision, Alex Kedas had at least one project and at least $2 million worth of projects. (Ex. 5, Smith Declaration at ¶ 8).

19. Andrea Childers is a female employee of IDOT. (ECF 12, ¶ 13).

20. Andrea Childers is a Resident Technician. (Ex. 1, Kedas Dep. at 24).

21. Childers was a subordinate employee and reported to Smith in 2017 and 2018. (Ex. 2, Smith Dep. at 70).

22. Previously, Childers worked for Plaintiff as supportive staff for inspecting projects. (Ex. 1, Kedas Dep. at 25-26).

23. A Resident Technician runs construction jobs but is not an engineer and does not have the qualifications to be a Resident Engineer due to education. (Ex. 2, Smith Dep. at 46).

24. Smith testified that the Senior Resident Engineers, Resident Engineers, and Resident Technicians he manages all run construction projects. (Ex. 2, Smith Dep. at 49).

25. Plaintiff's Complaint alleges that in April 2016, he filed an internal complaint alleging unfair treatment on the basis of his gender. (ECF 12, ¶ 14; Ex. 1, Kedas Dep. at 39).

26. Plaintiff testified that he filed complaints with the Office of Executive Inspector General (OEIG), Bureau of Investigations and Compliance (BIC), civil rights complaints, and filed

grievances, recalling one of those complaints filed with the OEIG in November 2014, one filed with BIC in October 2019, and another in July 2020 with OEIG and BIC. (Ex. 1, Kedas Dep. at 90).

27. In his April 2016 complaint, Plaintiff alleged that Michael Carnahan and Andrea Childers had an inappropriate personal relationship that affected Carnahan's judgment, prevented Plaintiff from getting one of the bigger projects that year, and that Andrea Childers was given a project ahead of him based on non-merit factors. (Ex. 1, Kedas Dep. at 40).

28. Mike Carnahan was Plaintiff's supervisor from March 2008 until December 2014. (Ex. 1, Kedas Dep. 48-49).

29. When Plaintiff filed his complaint in April 2016, Carnahan was not his supervisor. (Ex. 1, Kedas Dep. at 49).

30. Michael Carnahan was a Supervisory Search and Field Engineer with IDOT, but has since retired. (Ex. 4, Crawford Dep. at 9-10).

31. The project Plaintiff complained Childers received over him was a project that involved patching and resurfacing. (Ex. 1, Kedas Dep. at 46).

32. Plaintiff testified that he believed Childers was unqualified for the project because she had no engineering education, she did not have enough years of construction experience, and there were five other more qualified four-year resident engineers, with many more years of education than her, or who could have benefitted from the career development toward their professional engineer (PE) license. (Ex. 1, Kedas Dep. at 46-47).

33. Specifically, Plaintiff testified that the five other resident engineers who were more qualified and would have been better for the job than Childers were Jack Harper, Amber West, Monroetta Gutterridge, Ted Cuson, and Jay Hanner. (Ex. 1, Kedas Dep. at 47-48).

34. Amber West and Monroetta Gutterridge are females. (Ex. 1, Kedas Dep. at 20-22).

35. Plaintiff alleges that after he filed his April 2016 complaint, his supervisor at IDOT engaged in a pattern of retaliation that included discipline for no basis, reprimands, discipline hearings, loss of pay bonuses, evaluations lower than they should have been, and reduction in job responsibilities and assignments. (Ex. 1, Kedas Dep. at 51-52).

36. Plaintiff was disciplined prior to filing his April 2016 complaint. (Ex. 1, Kedas Dep. at 52).

37. According to Plaintiff, his project assignments were reduced so he had smaller jobs of "only a million and a half worth of work in 2018 specifically, and I had reduced overtime, and then throughout the rest of my career I was denied experiences that would help me get promotions and build my resume for a consultant career when I eventually retired in […] 2025," along with humiliation, embarrassment, and damage to his reputation and the appearance to contractors and engineering consultants, and his reduced professional standing at IDOT. (Ex. 1, Kedas Dep. at 56-57).

38. Plaintiff did not apply for any promotion at IDOT after 2016. (Ex. 1, Kedas Dep. at 57-59).

39. None of the jobs that Plaintiff was working on at the time he filed his complaint in April 2016 were taken away from him following the filing of his complaint. (Ex. 1, Kedas Dep. 68).

40. Plaintiff was assigned new projects in 2017 in the new construction season, which runs from March to November. (Ex. 1, Kedas Dep. at 68)

41. One of the projects he was assigned in 2017 was worth about $8 million. (Ex. 1, Kedas Dep. 68-69)

42. In 2017, Plaintiff also had a project involving a traffic signal intersection and an interstate patching job. (Ex. 1, Kedas Dep. at 69).

43. Prior to 2016, Plaintiff worked on interstate patching and resurfacing and separate interstate patching jobs. (Ex. 1, Kedas Dep. at 69).

44. In 2017, Smith assigned Plaintiff the most complex job in the region, being Contract 70A12, I-57 Resurfacing, which was valued at $14.3 million. The next closest project in complexity and dollar amount was in the Bloomington Field Area and was worth $6.4 million. (Ex. 5, Smith Declaration, ¶ 2).

45. During this project, Plaintiff authorized $100,000 in patching without authorization from Smith when he (Kedas) only had authority to authorize up to $20,000 without supervisory approval according to Construction Memorandum 04. (Ex. 5, Smith Declaration, ¶ 3).

46. Plaintiff admitted to exceeding the $20,000 limit (included in his job description), which he was not allowed to do without supervisor approval, which he did not receive. (Ex. 1, Kedas Dep. at 34-37).

47. The Construction Field Engineer is only approved to authorize up to $40,000, so this work exceeded Smith's approval level as well, and would have required Kenneth Crawford's approval as Project Implementation Engineer/acting Construction Engineer. (Ex. 5, Smith Declaration, ¶ 4).

48. Plaintiff believes he suffered a hostile work environment because he received the worst performance evaluations he ever received in his career, there was increased scrutiny, he failed to receive a bonus, there was reprimand and disciplinary counseling, and his project assignments were reduced. (Ex. 1, Kedas Dep. at 71).

49. The bonus structure did not affect IDOT employee salaries. (Ex. 1, Kedas Dep. at 75-76).

50. Plaintiff was accused of being insubordinate prior to 2016. (Ex. 1, Kedas Dep. 79-80).

51. Plaintiff believed he was ostracized by his supervisors because there was an inner circle that he did not belong to and that he was not invited to participate in anything. (Ex. 1, Kedas Dep. at 80).

52. Plaintiff believed this inner circle existed prior to 2016. (Ex. 1, Kedas Dep. at 81).

53. Plaintiff believed his seniority status and project assignments were reduced because he "was the most qualified engineer, senior engineer, resident engineer to be assigned the I-74/I-75 interchange reconstruction project that started this year [2021], and I was not assigned that project." (Ex. 1, Kedas Dep. at 83).

54. Jack Harper received this job. (Ex. 1, Kedas Dep. at 84).

55. When asked what kind of jobs he was given at that time, Kedas testified "they had not announced--they had not told me what jobs I was going to be given, but a $200 million interchange reconstruction is definitely the biggest and most complicated project this year [2021] and for the last six years, and Jack Harper does not have a PE license. He's just a resident engineer, he's not a senior resident engineer, and he does not have my experience." (Ex. 1, Kedas Dep. at 84).

56. Plaintiff did not know if Jack Harper filed a complaint alleging Andrea Childers was treated more favorably because she was female. (Ex. 1, Kedas Dep. at 41, 45).

57. On a personal level, Smith had no problem with Plaintiff. (Ex. 2, Smith Dep. 80).

58. On a professional level, Plaintiff was often insubordinate to Smith. (Ex. 2, Smith Dep. at 81).

59. Smith testified that Plaintiff refused to do assignments and did not follow directives he gave to Plaintiff. (Ex. 2, Smith Dep. at 76).

60. Smith testified that at the beginning of his time supervising Plaintiff, he asked Plaintiff not to email inappropriate people and Plaintiff repeatedly violated that directive. Smith also testified that in a phone conversation with the owner of Path Construction, Smith asked Plaintiff to explain what was going on with a suicidal employee and let Path Construction decide what they should do with the employee rather than give an immediate directive to remove him (the employee), and Plaintiff immediately requested the employee be removed. (Ex. 2, Smith Dep. at 74-79).

61. Kenneth Crawford (Crawford) serves as the Project Implementation Engineer in a full-time capacity and as the Construction Engineer in an acting capacity. (Ex. 2, Smith Dep. at 17)

62. Kensil Garnett (Garnett) serves as Region 3, Engineer, Civil Engineer IX. (Ex. 3, Garnett Dep., at 6).

63. Garnett is Crawford's supervisor, Crawford is Smith's supervisor, and Smith is Plaintiff's supervisor. (Ex. 2, Smith Dep. at 18).

64. Smith did not know Carnahan's thoughts of Plaintiff, or any employee's thoughts of Plaintiff prior to assuming his position in 2015. (Ex. 2, Smith Dep. 63-64).

65. Smith was aware of the April 2016 complaint Plaintiff filed alleging Carnahan favored Childers in assigning projects. (Ex. 2, Smith Dep. at 84).

66. Smith's knowledge of this complaint did not have any influence in the projects he assigned to Plaintiff. (Ex. 2, Smith Dep. at 84).

67. In 2016, Crawford was Jason Smith's direct supervisor. (Ex. 4, Crawford Dep., at 23).

68. Crawford did not tell Smith who to assign to jobs, unless he was asked for advice. (Ex. 4, Crawford Dep., at 23).

69. Smith did not say to Crawford that he was not going to assign Plaintiff a job because of the complaint he filed in 2016 that alleged gender discrimination or preference in job assignments to Andrea Childers. (Ex. 4, Crawford Dep. at 24).

70. Garnett began having concerns with Plaintiff in 2008. (Ex. 3, Garnett Dep. at 10).

71. At Garnett's direction, Plaintiff underwent a fitness review evaluation because "we were having issues with, with the arguments, with the field engineer not accepting supervision, and issues with other employees, issues with contractors." (Ex. 3, Garnett Dep. at 13-14).

72. Under the direction of the statewide employee program assistant, as part of that fitness review evaluation, Garnett had received feedback from two contractors, Open Road Paving and Stark Excavating, who had issues with Plaintiff. (Ex. 3, Garnett Dep. at 14-15).

73. Plaintiff habitually questioned decisions made by supervisors (Smith, Carnahan, Crawford, and Garnett), related to job assignments, which included telling his supervisor that the assignments were incorrect and telling supervisors who, in his mind, should be running jobs, which was most often himself. (Ex. 5, Smith Declaration at ¶ 10).

74. Garnett found it problematic that Plaintiff questioned job assignments because under the union contract, it is management's rights to make job assignments. (Ex. 3, Garnett Dep. at 21-23).

75. Plaintiff's job description does not say that because he is a senior resident engineer, he should receive the largest job or most complex job in the district. (Ex. 3, Garnett Dep. at 22).

76. Neither the union contract nor the job description affords a Senior Resident Engineer the ability to choose their own projects. Rather, that responsibility lies with the Construction Field Engineer. (Ex. 5, Smith Declaration at ¶ 6).

77. The prestige and importance of a job assignment is not determined by the monetary value of the job, but rather the complexity of the job. (Ex. 5, Smith Declaration at ¶ 9).

### III.  STANDARD OF REVIEW

Summary judgment is proper if the pleadings, answer to interrogatories, depositions, and admissions, along with declarations, show that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. Fed. R. Civ. P. 56(c). An issue of material facts exists only if the "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are any genuine issues of material fact, the court must draw all inference in the light most favorable to the non-movant. *Dix v. Edelman Fin. Serv., LLC*, 978 F. 3d 507, 512 (7th Cir. 2020).

To defeat a motion for summary judgment, a plaintiff must show concrete evidence documenting a genuine issue of fact which is material in the sense that it is outcome determinative. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2007). A plaintiff must show, not only that there is a factual dispute, but also that there is sufficient evidence to enable a jury to render a verdict in plaintiff's favor. *Anderson*, 477 U.S. at 249. "Inferences and opinions must be grounded on more than flights of fancy, speculation, hunches, intuitions, or rumors . . . ." *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). A defendant moving for summary judgment on the grounds that a plaintiff cannot prove an essential element of the case that the plaintiff must prove at trial,

has no burden to support his motion with declarations or other evidence negating the plaintiff's claim. *Modrowski v. Pigatto*, 712 F.3d 1166, 1268-70 (7th Cir. 2013). Instead, a defendant may simply point out to the court the absence of evidence to support the claim that the plaintiff bears the burden of proving at trial. *Id.* at 1168.

IV.    **ARGUMENT**

Plaintiff did not suffer an adverse employment action. Even if the Court finds Plaintiff did suffer an adverse employment action, Plaintiff has failed to establish a but-for casual connection between that adverse action and Plaintiff's action of filing his April 2016 complaint. Therefore, Plaintiff's claim of retaliation fails.

**A. Platiniff Did Not Suffer an Adverse Employment Action.**

Plaintiff's retaliation claims alleging adverse employment actions fail because he cannot show he suffered a materially adverse employment action because of his April 2016 complaint. *See Lewis v. City of Chicago*, 496 F.3d 645, 652-53 (7th Cir. 2007); *Barton v. Zimmer*, 662 F.3d 448, 543 (7th Cir. 2011). "A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quotation omitted), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). It is well-established that "not everything that makes an employee unhappy is an actionable adverse action." *Lewis*, 496 F.3d at 652-53. The Seventh Circuit has identified three general categories of actionable, materially adverse employment actions: (1) an employee's compensation is diminished or he is fired; (2) a nominally lateral transfer or other change in his job significantly reduces his career prospects; or (3) work conditions are changed so as to subject him to "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment." *Nagle v. Vill. of*

*Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (internal citations omitted). A denial of a raise can be an adverse employment action while the denial of a "more transient" payment such as a bonus is not. *Lewis*, 496 F.3d at 653 (internal citation omitted).

As an initial matter, it cannot be said Plaintiff was treated differently because of his gender, as he alleged in his April 2016 complaint, as he testified he believed two women, Amber West and Monroetta Gutterridge, were more qualified for the project Childers was assigned. (UMF ¶¶ 33-34).

Still, Plaintiff cannot establish any one of the three actionable, materially adverse employment actions. First, Plaintiff was never fired from his employment with IDOT and his compensation was never diminished. (UMF ¶ 6). Rather, Plaintiff stayed employed with IDOT as a Senior Resident Engineer for five years after he filed his 2016 complaint and voluntarily separated his employment with IDOT. (UMF ¶¶ 4-5). Even after he filed his complaint in 2016, his ongoing assignments were not taken away from him and he subsequently received projects valued at $8 million and $14.3 million. (UMF ¶¶ 39-41, 44). Even though Plaintiff claimed he never received a bonus, he admitted the bonus never affected his salary, and the Court does not consider the denial of a bonus to be an adverse employment action. (UMF ¶¶ 48-49).

Second, Plaintiff's job did not change and reduce his career prospects. Plaintiff was a Senior Resident Engineer from April 1998 to March 2021 when he left IDOT. (UMF ¶¶ 4-6). That is, even after he filed his complaint in April 2016, Plaintiff remained a Senior Resident Engineer. Both prior to 2016 and in 2017, Plaintiff worked on the same projects—interstate patching jobs. (UMF ¶¶ 42-43). Even after he filed his 2016 complaint, Plaintiff was assigned projects worth $8 million and $14.3 million. (UMF ¶ 41, 44). The prestige and importance of a job assignment is not determined by the monetary value of the job, but rather the complexity of the job. (UMF ¶ 77).

And Plaintiff never even applied for a promotion after 2016. (UMF ¶ 38). Further, Plaintiff's job prospects have not changed because when he retired, he started his own engineering consulting firm and he still maintains his professional engineering license. (UMF ¶ 7-9).

Third, and finally, there was no negative alteration in Plaintiff's workplace environment. In fact, in 2017, after he filed his complaint in April 2016, he was assigned a job worth $8 million and a job worth $14.3 million, both well within the $2 to 25 million range described in his job description. (UMF ¶ 41, 44). Though Plaintiff claims there was an "inner circle" at IDOT that he was not a part of, he admitted that this inner circle existed before 2016. (UMF ¶¶ 51-52). As Plaintiff cannot demonstrate he suffered an adverse employment action, IDOT is entitled to summary judgment.

### B. Plaintiff Failed to Show Retaliation.

Plaintiff failed to produce evidence showing that he was retaliated against for engaging in statutorily protected activity. Title VII prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). To survive summary judgment on a Title VII retaliation claim, "an employee 'must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (2) there existed a but-for causal connection between the two.'" *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017)) (alteration in original). "We consider the evidence as a whole and conduct a 'straightforward inquiry: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [materially adverse action]?" *Id*. (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). Plaintiff failed to show a but-for causal

connection between his protected activity and the materially adverse action taken against him, therefore his retaliation claim fails.

In this case, it is undisputed that Plaintiff engaged in a protected activity when he submitted his April 2016 complaint alleging gender discrimination. (UMF ¶ 25). Under the direct method, to prove causation, the plaintiff must show that "'the desire to retaliate was the but-for cause of the challenged employment action,'" which "'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Eaton v. J.H. Findorff & Sons, Inc.*, --- F.3d ---, 2021 WL 2449875, *2 (7th Cir. 2021) (quoting *Garcia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016)). Causation can be established by circumstantial evidence which includes "suspicious timing, a pretextual explanation for the termination, [] evidence that similarly situated employees were treated differently" and any "other evidence from which an inference of discriminatory intent might be drawn." *Abrego*, 907 F.3d at 1015 (quoting *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). A lapse of time between the protected activity and the adverse action greater than a few days will not support an inference of causation supported solely on the basis of a suspicious-timing. *Igasaki v. Ill. Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 959 (7th Cir. 2021). However, "suspicious timing is rarely enough to create a triable issue." *Id.* Plaintiff failed to present any evidence that would permit a jury to infer that his 2016 complaint caused him to suffer any retaliation.

Plaintiff has not produced any direct evidence that IDOT retaliated against him because of his 2016 complaint. Smith, Plaintiff's supervisor, knew about Plaintiff's complaint and was responsible for assigning jobs to Plaintiff, but did not assign those jobs based on Plaintiff's complaint. (UMF ¶ 65-66). Smith did not tell Crawford that he was not assigning Plaintiff jobs because of the complaint he filed in 2016. (UMF ¶ 67-68). Smith does not even have the authority

to make any employment decisions, he only can recommend discipline to personnel staff. (UMF ¶¶ 14-15). Further, in 2017, after he filed his 2016 complaint, Plaintiff was assigned a $8 million project and a $14.3 million project, in accordance with his job description. (UMF ¶ 41, 44).

There is also no suspicious timing in this case because Plaintiff's protected activity was too attenuated from any adverse action he claims he suffered. In support of his claims of reduced seniority status and job assignments, Plaintiff contends he was not offered a job in 2021 that, according to him, was the biggest and most complex, being worth $200 million. (UMF ¶ 53, 55). Jack Harper received this job assignment. (UMF ¶ 54). But this does not establish a causal connection between Plaintiff's protected activity and an adverse action because not only did Plaintiff not know if Jack Harper filed any complaints similar to his 2016 complaint, but a job assignment in 2021 is five years from the date of Plaintiff's protected activity. (UMF ¶ 56). The Seventh Circuit has held that much shorter intervals between the protected activity and adverse action are too long to suggest a causal nexus without additional evidence. *E.g.*, *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 360–61 (holding interval of 10 months between lawsuit and termination did not create a causal nexus without additional evidence); *Mollet v. City of Greenfield*, 926 F.3d 894, 898 (7th Cir. 2019) (holding interval of one month between an employee's complaint and the start of criticism of that employee, which lead to the employee's constructive discharge nearly a year later, did not establish causation because there was no evidence connecting the complaint with the criticism); *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (a span of nearly a year between protected activity and termination, and nine months between protected activity and discipline undermined any inference of causation); *Carter v. Chi. State Univ.*, 778 F.3d 651, 658 (7th Cir. 2015) ("[W]e do not find a span of seven months to be suspicious.") (also collecting cases where five-, six-, and nine-month gaps were too large to be suspicious). These cases make it clear

that the *five-year span* between Plaintiff's protected activity and the adverse action is too great to be suspicious.

Through the indirect method, to establish a prima facie case of retaliation the plaintiff must show he (1) engaged in statutorily protected activity, (2) he suffered a materially adverse employment action, (3) he met the employer's legitimate expectations, and (4) he was treated less favorably than employees who did not engage in the statutorily protected activity. *Leonard v. Eastern Ill. Univ.*, 606 F.3d 428, 431 (7th Cir. 2010). Once the Plaintiff meets this initial burden, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its action. *Williams*, 983 F. at 509. The Plaintiff must then establish that the employer's proffered reason is pretextual. *Id.* Plaintiff has failed to establish Defendant retaliated against him through either the direct or indirect method.

Plaintiff cannot show that he met IDOT's legitimate expectations. Plaintiff admitted to exceeding his authorized $20,000 limit in additional patching work, which he was not allowed to do without supervisor approval, which he did not receive. (UMF ¶ 46). This is no small matter, as this occurred during the $14.3 million project Smith assigned him in 2017, and Plaintiff authorized *$100,000* in patching without authorization from Smith, well over the $20,000 limit Plaintiff had the authority to approve. (UMF ¶¶ 44-45). To put this in perspective, Smith was only approved to authorize up to $40,000, this work exceeded Smith's approval level as well, and would have required Crawford's approval as Project Implementation Engineer/acting Construction Engineer. (UMF ¶ 47). Garnett even had statements and spoke to contractors who had issues with Plaintiff. (UMF ¶¶ 71-72). Plaintiff habitually questioned decisions made by supervisors related to job assignments, which included telling his supervisor that the assignments were incorrect and telling supervisors who, in his mind, should be running jobs, which was most often himself. (UMF ¶ 73).

Garnett found this problematic because under the union contract, it is management's rights to make job assignments, and neither the union contract nor the job description affords a Senior Resident Engineer the ability to choose their own projects. (UMF ¶¶ 74-76). Rather, that responsibility lies with the Construction Field Engineer. (UMF ¶ 76). Smith also testified to many incidents where Plaintiff was insubordinate to him and did the direct oppositive of Smith's directive to him. (UMF ¶ 58-59). In one instance, Smith asked Plaintiff not to email inappropriate people and Plaintiff repeatedly violated that directive. (UMF ¶ 60). In another instance, Smith asked Plaintiff to explain to Path Construction what was going on with a suicidal employee and let Path Construction decide what they should do with the employee, not give an immediate directive to remove the employee, and Plaintiff immediately requested the employee be removed. (UMF ¶ 60). And, significantly, Plaintiff was insubordinate prior to 2016. (UMF ¶ 50). For these reasons, summary judgment should be granted in favor of Defendant.

## V.      CONCLUSION

Plaintiff did not suffer an adverse employment action as even after he filed his complaint in April 2016, he remained employed with IDOT and maintained his position as Senior Resident Engineer from 1998 until he left IDOT in 2021. Even after he filed his April 2016 complaint, he was assigned the most complex job in the region. While Plaintiff was not promoted after 2016, he never applied for a promotion. After he filed his complaint in 2016, none of the jobs he was working on were taken away from him. Further, Plaintiff cannot establish a prima facie case of retaliation because not only did he not suffer an adverse employment action, but he cannot establish a causal connection between his protective activity and the alleged adverse employment action.

WHEREFORE, Defendant Illinois Department of Transportation requests that the Court grant summary judgment in its favor.

        Respectfully submitted,

        ILLINOIS DEPARTMENT OF
        TRANSPORTATION,

            Defendant,

        Kwame Raoul, Attorney General,
        State of Illinois,

            Attorney for Defendant,

By:   s/Taylor R. Traynoff_____
      Taylor R. Traynoff, #6330557
      Assistant Attorney General
      500 South Second Street
      Springfield, Illinois 62706
      Phone: (217) 782-5189
      Facsimile: (217) 524-5091
      E-Mail: taylor.traynoff@ilag.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| ALEX KEDAS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ILLINOIS DEPARTMENT OF )<br>TRANSPORTATION, )<br>)<br>Defendant. ) | Case No. 19-2113-CSB-EIL |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2022, I caused a copy of the foregoing *Memorandum of Law in Support of Defendant's Motion for Summary Judgment* to be electronically e-filed with the Clerk of the Court, which will send electronic notice of same to the following:

John A. Baker    jab@bbklegal.com

By:   s/Taylor R. Traynoff
Taylor R. Traynoff, #6330557
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62706
Phone: (217) 782-5819
Facsimile: (217) 524-5091
E-Mail: taylor.traynoff@ilag.gov