2:19-cv-02113-CSB-EIL # 31-3   Page 1 of 44
Kenneth Crawford
February 17, 2022

EXHIBIT 3   E-FILED
Wednesday, 23 March, 2022  06:10:25 PM
Clerk, U.S. District Court, ILCD

1            IN THE UNITED STATES DISTRICT COURT

         FOR THE CENTRAL DISTRICT OF ILLINOIS

2                    URBANA DIVISION

3

4    ALEX KEDAS,                     )
                                     )
5              Plaintiff,            )
                                     )
6              -v-                   )No. 19-cv-2113
                                     )
7    ILLINOIS DEPARTMENT OF          )
     TRANSPORTATION.                 )
8                                    )
               Defendant.            )
9

10

11          DEPOSITION OF KENNETH CRAWFORD

                 February 17, 2022

12                    1:00 p.m.

13

14          Called as a witness by the Plaintiff

15   herein, through subpoena, pertaining to the taking

16   of depositions for the purpose of discovery before

17   PAMELA C. TAYLOR, CSR/RPR, License No. 084-001184, a

18   Notary Public qualified and commissioned for the

19   State of Illinois, taken via Zoom conference.

20

21

22

23

24

                                          Page 1

**EXHIBIT 3**

```
 1      APPEARANCES:

 2

 3              BAKER, BAKER & KRAJEWSKI,
                BY:  MR. JOHN A. BAKER,
 4              415 S. Seventh Street
                Springfield, Illinois, 62701
 5              (217)522-3445
                jab@bbbklegal.com
 6              Appeared on behalf of the Plaintiff,

 7

 8              ILLINOIS ATTORNEY GENERAL,
                MR. KWAME RAOUL,
 9              BY:  MS. TAYLOR TRAYNOFF,
                Assistant Attorney General
10              500 S. 2nd Street
                Springfield, Illinois 62704
11              (217)782-1090
                taylor.traynoff@ilag.gov
12              Appeared on behalf of the Defendant.

13

14

15

16

17

18

19

20

21

22

23

24
```

Page  2

1                          I N D E X

2

3      WITNESS:                          EXAMINATION

4      KENNETH CRAWFORD

5

6

7      Mr. Baker                                    4

8      Ms. Traynoff                                23

9

10

11                         E X H I B I T S

12     NONE

13

14

15

16

17

18

19

20

21

22

23

24

Atkinson-Baker, A Veritext Company
(818) 551-7300              www.veritext.com

```
 1                    KENNETH CRAWFORD

 2   having been first duly sworn, deposed and testified

 3   as follows:

 4                     EXAMINATION

 5                         BY

 6                    MR. BAKER:

 7        Q.   Good afternoon, sir.  Could you please

 8   state your full name?

 9        A.   Kenneth Devan Crawford.

10        Q.   All right, Mr. Crawford, my name is John

11   Baker.  I'm going to be asking you some questions

12   today.  Have you ever had your deposition taken

13   before, sir?

14        A.   No, sir.

15        Q.   Okay.  All I'm going to be doing is asking

16   you a series of questions, and I want you to answer

17   those to the best of your ability.  It's a little

18   bit different than if we were engaged in normal

19   conversations, so I want to go over just a couple of

20   rules real quickly for you just to follow along to

21   the best we can.

22             No. 1, you and I need to avoid speaking

23   over one another.  We want to develop a clear

24   record.  We've got a court reporter here taking down
```

Page  4

**EXHIBIT 3**

```
 1    everything that we're saying; so, it's important
 2    that, even if you know the question that I'm going
 3    to ask, allow me to fully ask the question so it
 4    appears on the record what I've asked, and then you
 5    give the full answer.  At the same time, if I don't
 6    allow you an opportunity to answer the question,
 7    please let me know.  I want to make sure that I'm
 8    not interrupting you, you have every opportunity to
 9    fully answer the question, okay?
10          A.   Yes, sir.
11          Q.   And, audible answers, yesses, nos, those
12    are good.  Shrugs of the shoulders and grunts,
13    "un-huh" and "un-un," those things are hard to get.
14    The goal is to make sure what we say is
15    memorialized.  So avoid, avoid nonverbal answers if
16    you can, and if we can get to that, I'll try to
17    remind you but it's hard to do, so.
18               The other thing is, if you don't
19    understand something I've asked, it's likely I
20    haven't asked it very well.  Please let me know.
21    And if you don't understand something, I'll make
22    sure that I ask it again.  I want to make sure that
23    everything I ask is clear, and that we're both on
24    the same page, and like I said, a lot of times I
```

1      don't do that very well.

2                So, but, and also, we'll probably take a

3      break.  I don't think this is going to take terribly

4      long, but if at any point and time you need a break

5      for any reason, again, whatever it is, I know the

6      weather is bad and you work with IDOT, if you need

7      to step away, or whatever, please come to me and

8      we'll arrange that.  Is that okay?

9            A.   Yes, sir.

10           Q.   Based upon my conversation with Mr. Smith

11     a little while ago, I understand that you work for

12     IDOT.  I also understand that currently it seems

13     that you wear a number of different hats, is that

14     fair?

15           A.   Yes, sir.

16           Q.   Okay.  What is your current job title with

17     IDOT?

18           A.   Project Implementation Engineer.

19           Q.   And can you explain to me what that

20     position is?

21           A.   I'm in charge of the Bureau of Project

22     Implementation.  The bureau is divided into local

23     roads, materials, and construction.

24           Q.   And is that for a particular region or

Atkinson-Baker, A Veritext Company
(818) 551-7300              www.veritext.com

**EXHIBIT 3**

1    district?

2         A.   It's for District 5.

3         Q.   And who is, who is your immediate

4    supervisor?

5         A.   Kensil Garnett.

6         Q.   And what position does Mr. Garnett

7    currently hold?

8         A.   He is the Region 3 Engineer.

9         Q.   If we were looking at a table of

10   organization for District 5, would you be -- sit at

11   top?

12        A.   No, sir.

13        Q.   All right.  Who -- what other positions --

14   are there other bureaus that would be in District 5?

15        A.   Yes, sir, there's the Bureau of Operations

16   and the Bureau of Program Development.

17        Q.   And now I imagine each of those has a

18   bureau chief as well?

19        A.   Yes, sir.

20        Q.   And those bureau chiefs would be

21   comparable in position to you?

22        A.   Yes, sir.

23        Q.   Is there anybody who would be above you in

24   the table of organization at District 5?

Page  7

 1          A.    Not at District 5.   Just Kensil Garnett is

 2    the Regional Engineer.

 3          Q.    My understanding, Mr. Garnet has

 4    responsibilities over both District 5 and District

 5    4?

 6          A.    Yes, sir.

 7          Q.    Now, you talked about the Bureau of

 8    Project Implementation.   Can you briefly describe

 9    what the role and responsibility of that bureau is?

10          A.    The Bureau of Project Implementation is

11    responsible for overseeing federal dollars that fund

12    construction projects in the district, whether it's

13    materials that are put into the job or whether it's

14    at a local agency.   So, we just make sure that the

15    jobs are billed according to the live and grades and

16    specifications that they're build upon.

17          Q.    How many people approximately work in the

18    bureau?   I know they might fluctuate a little, but

19    approximately how many?

20          A.    Fifty to 60.   That's an approximation.

21          Q.    I understand, I understand.   And I'm not

22    trying to hold you to it.   I'm just trying to get a

23    sense so that I can understand how big the project

24    or bureau is.

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1          And, so, I told you earlier, I spoke with

2    Mr. Smith earlier, and I understand that he reports

3    directly to you?

4          A.    Yes, sir.

5          Q.    And what is Mr. Smith -- do you know, when

6    I say Mr. Smith, I'm referring to Jason Smith; what

7    is his job position or job responsibilities?

8          A.    He's the supervisory construction field

9    engineer.  He is responsible for construction

10   projects with, that have federal funds.  He's

11   responsible for overseeing and helping with the

12   day-to-day construction activities of several

13   projects.

14         Q.    And I understand that he has two other,

15   two other individuals who have the same job title

16   and have those same types of responsibilities?

17         A.    Yes, sir.

18         Q.    And, if I say the name, Mike Carnahan,

19   does that mean something to you?

20         A.    Yes, sir.

21         Q.    And Mr. Carnahan, I understand, is now

22   retired from IDOT; is that correct?

23         A.    Yes, sir.

24         Q.    And he used to be employed in the

**EXHIBIT 3**

1    district, is that fair?

2          A.    Yes, sir.

3          Q.    What position did Mr. Carnahan hold?

4          A.    He was a Supervisory Search and Field

5    Engineer.

6          Q.    So, that would have been the same job

7    title that Mr. Smith currently holds, is that

8    correct?

9          A.    Yes, sir.

10         Q.    And, I'm sorry, how long have you been in

11   your current position?

12         A.    I began in an acting position in this,

13   April of 2014, and was promoted full-time in January

14   of 2017.

15         Q.    So this, this April it will be eight years

16   in your current position?

17         A.    Yes, sir.

18         Q.    What other positions have you held at

19   IDOT?

20         A.    I was a civil engineer, construction

21   inspector, then I became a resident engineer in

22   2000.  And until 2008, I became an acting

23   supervisory construction field engineer in 2008.  I

24   became -- interviewed and became full-time in 2009,

 1      I'm not sure of the month, and then was asked to be

 2      the acting construction engineer January 1st of

 3      2013?  Yes, 2013.

 4           Q.   Okay, and what is your educational

 5      background?

 6           A.   I have a degree in civil engineering from

 7      the University of Illinois.

 8           Q.   And what year did you get that degree?

 9           A.   1997.

10           Q.   At any point in time has Alex Kedas been a

11      direct report of yours?  I understand that there was

12      a period of time that he was subordinate to you.  At

13      any point and time was he a direct report to you?

14           A.   Yes.

15           Q.   And when was that?

16           A.   In 2015?  I -- I'm sorry, I believe he was

17      assigned to George Davis in 2015, and George Davis

18      retired in July of 2015.  At that point, I took over

19      George Davis' field area.

20           Q.   Okay, so, Mr. Davis would have held a

21      position comparable to that that Mr. Smith currently

22      holds and comparable to that that Mr. Carnahan used

23      to hold, is that correct?

24           A.   Yes, sir.

                                        Page 11

**EXHIBIT 3**

1        Q.   And Mr. Kedas would have been assigned to

2   work under Mr. Davis?

3        A.   Yes, sir.

4        Q.   And once he retired, there was nobody

5   there to come in immediately to fill that position,

6   so, you assumed another acting role to take that

7   over, is that fair?

8        A.   Yes, sir.

9        Q.   And how long did you serve as the direct

10   supervisor to Mr. Kedas?

11        A.   I believe I just finished out the year, so

12   the end of January -- the end of December, excuse

13   me, the end of the year.

14        Q.   So, for half of 2015, is that fair?

15        A.   Yes, sir.

16        Q.   During the period of time that you were

17   his immediate supervisor, did you have any problems

18   with any of the work that Mr. Kedas had performed?

19        A.   No, sir.

20        Q.   Prior to becoming his supervisor, had you

21   heard any complaints or criticisms about Mr. Kedas'

22   work or his overall job performance?

23        A.   I heard from Mike Carnahan that he and

24   Alex were frequently arguing.

**EXHIBIT 3**

1    Q.   And did Mr. Carnahan tell you what the

2    nature of those arguments were?

3    A.   No.  I did witness one.

4    Q.   Okay, so other than what you witnessed, do

5    you have any knowledge of any of the arguments

6    between Mr. Carnahan and Mr. Kedas, whether you

7    heard it about from somebody or read something about

8    it, any knowledge about anything other than the one

9    you witnessed?

10   A.   There was one that Mike told me about.

11   There was a homeowner on the job that Alex was

12   working, and something happened between Alex and the

13   homeowner.  And the homeowner called and complained

14   to the district.  I don't know who they spoke to,

15   but Mike instructed Alex not to speak to that

16   homeowner again at all calls, and dealings with that

17   homeowner would be dealing with Mike Carnahan.

18   Q.   And then did something else happen other

19   than just the complaint or after that?

20   A.   There was an argument between Mike and

21   Alex.  I don't know exactly what that was about or

22   when that was.

23   Q.   And was that the argument that

24   Mr. Carnahan told you about or the argument that you

EXHIBIT 3

1      witnessed?

2              A.    I witnessed it.

3              Q.    And what, what do you recall about the

4      argument?

5              A.    That it got heated.  I don't remember what

6      it was about, I don't remember what day it was.

7              Q.    But this, did it deal with this particular

8      complaint about this homeowner about Alex?

9              A.    I don't remember, I don't know.

10             Q.    Okay, all right.  Any other arguments

11     between Mr. Carnahan and Mr. Kedas that you're aware

12     of, either by observation or that you heard about

13     from somebody or read about other than what you have

14     already described?

15             A.    Not that I can remember.

16             Q.    Do you recall at some point and time that

17     Mr. Kedas was sent for a fitness review evaluation?

18             A.    Yes.

19             Q.    And do you know who made that decision

20     that Mr. Kedas would be sent to the Fitness Review

21     Evaluation?

22             A.    Kensil Garnet.

23             Q.    And did Mr. Garnet explain to you why that

24     decision was made?

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1          A.    No.

2          Q.    So, do you know why he was sent to the

3    Fitness Review Evaluation?

4          A.    I know that Mike and I went to Kensil and

5    asked him to help with the arguing, and then I don't

6    know why he made that decision to say he was unfit

7    to lead.

8          Q.    And during that period of time when

9    Mr. Carnahan was a supervisor, was Alex ever issued

10   any sort of discipline that you recall?  If you

11   could give the time that you would have been

12   Mr. Carnahan's supervisor and Mr. Carnahan was

13   Alex's immediate supervisor?

14         A.    I don't remember, sorry.

15         Q.    No, you don't have to apologize.  All I

16   can do is ask you about what you recall.  And I

17   recognize a lot of these things happened long ago

18   and years ago, and you got a lot of other things

19   going on.  All I can ask you about is what you know,

20   so that's what I'm trying to do.

21              So, at some point in time, you took over

22   the supervision of Mr. Kedas and then Mr. Smith was

23   promoted into a position that he currently holds and

24   was assigned to supervise Mr. Kedas, do you recall

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

 1    that?

 2         A.   Yes, sir.

 3         Q.   Okay, after Mr. Smith took over, do you

 4    recall any concerns or complaints or criticisms

 5    about Mr. Kedas or about the way he was performing

 6    his job duties?

 7         A.   Can you be more specific?  I mean, are you

 8    talking about a general timeframe?  I'm sorry, I'm

 9    confused.

10         Q.   No, no, my understanding is that I believe

11    it was exactly -- I believe it was maybe March of

12    2016 when Mr. Smith became Alex's supervisor?

13         A.   Yes, sir.

14         Q.   And I believe, and certain in that

15    position for several years, but during that period

16    of time, I know that there was some discipline and

17    some issues involving Mr. Gar -- or excuse me,

18    Mr. Smith and Mr. Kedas.  And what I'm trying to do

19    is get a sense of what of those issues you can

20    recall.  And I know that there's documentation.  I

21    guess I'm just trying to get a sense of your

22    personal recollection of any of those issues or

23    problems or concerns between the two of you.

24              And do you recall any of those?

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**EXHIBIT 3**

1       A.   There were instances where inappropriate

2    email recipients were included on emails that, I

3    believe, Jason asked him not to do.

4            There were -- there was an instance where

5    specifically Alex was questioning the number of

6    police callback hours were allocated to a job, and

7    Jason asked him to -- asked him if he would like to

8    have an internal conversation about it, they could.

9    And Alex forwarded that email to other people that

10   were not internal, including the chief counsel, I

11   believe.  I'm not sure.  I know that happened.

12   There were others.

13       Q.   Do you recall any of the others?

14       A.   I'm drawing a blank, sorry.

15       Q.   No, you're fine.

16            Do you recall being in a meeting sometime

17   in 2016 with Alex, Mr. Smith, and Mr. Garnet where

18   there was discussions about Alex's concerns about

19   Andrea Childers?

20       A.    Not about Andrea Childers.  The meeting

21   that we had was about questioning of job

22   assignments, I don't recall it being about Andrea

23   Childers at that time.  I believe it was just about

24   Alex questioning why -- okay, maybe it was why

1    Andrea got the job, I guess, okay.  So, I guess,

2    yes, I do remember that.

3        Q.   What do you recall about that particular

4    meeting?

5        A.   That Kensil asked Alex not to question a

6    decision made by a supervisor, and it was, it was an

7    oral counseling meeting.

8             And I recall that Kensil told Alex that

9    the accusations between Mike and Andrea had been

10   investigated.

11       Q.   Other than Kensil saying that it had been

12   investigated, do you know if, in fact, it had been

13   investigated?

14       A.   No, I do not.

15       Q.   You never saw any investigatory report or

16   you were involved in any investigation of that?

17       A.   No, I was not.

18       Q.   Do you recall at some point and time in

19   2016 Alex expressing verbally to you concern that he

20   had about Andrea being given preferential treatment

21   by Mr. Carnahan?

22       A.   Yes.

23       Q.   And what do you recall about that

24   conversation?

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

1          A.    That he believed that Andrea was trying to

2    manipulate Mike Carnahan to give her favorable job

3    assignments.

4          Q.    All right.  Did he say what type of

5    manipulation was being used, or did he explain it in

6    any way?

7          A.    I don't recall exactly.

8          Q.    And when he brought that to your

9    attention, what was your response or what did you do

10   with that information?

11         A.    I don't recall what I did with it.  I

12   never was handed anything.  I guess I don't know.

13         Q.    Do you recall if you discussed it with

14   Mr. Carnahan?

15         A.    I did not discuss it with Mr. Carnahan.

16         Q.    Do you know if you discussed it with

17   Mr. Garnett?

18         A.    I do not know at that time if I did until

19   the accusation was sent in.  I do not know if I

20   discussed it, I can not remember.

21         Q.    After the -- after the -- after the

22   documentation was sent in by Alex, did you have a

23   discussion with Mr. Garnett about the issue before

24   the meeting that you attended when Alex was present?

**EXHIBIT 3**

```
 1            A.    Yes.
 2            Q.    Okay.  When did that occur?
 3            A.    Prior to the meeting, I don't know what
 4      date.
 5            Q.    Okay, what do you -- was anybody else
 6      present for that conversation other than you and
 7      Mr. Garnett?
 8            A.    I do not remember.
 9            Q.    Do you recall what was discussed?
10            A.    No, not necessarily, I don't.  I'm not
11      going to speculate.  I do not remember.  I'm sorry.
12            Q.    Again, don't apologize, if you don't
13      remember, you don't remember, I certainly understand
14      that.
15                  Do you know if Mr. Garnet was upset that
16      Alex had made that complaint?
17            A.    I do not know.
18            Q.    Did you -- you sort of discussed some
19      issues that Alex had with -- with both of his
20      immediate supervisors.  Did you personally have any
21      disputes with Alex or disagreements of any kind?
22            A.    I don't think so, I don't recall.
23            Q.    And I guess, what I'm trying to
24      understand, it seems as though you discussed
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1    problems and concerns and issues that, that

2    Mr. Carnahan had when they were arguing and they

3    discussed concerns and problems that Mr. Smith had

4    were also brought to your attention where directives

5    were given and supposedly Alex didn't comply with

6    those, but as far as you, in giving specific

7    directives or arguing with Alex, did that ever

8    occur, if you recall?

9        A.   There was one time on a contract in on

10   Prospect Avenue where we had to close a sidewalk

11   because of the dangerous condition, and he asked me

12   to confirm that I had spoke to the Bureau of Safety

13   and the Bureau of Construction, and I told him that

14   I had, and that it was -- we were -- I directed him

15   to go ahead and close the sidewalk during the

16   dangerous condition, and he sent an email asking if

17   I was sure and on the phone call as well.

18       Q.   Did he say he --

19       A.   I'm not sure.  I'm sorry.  I interrupted.

20       Q.   No, you're fine.  Go ahead.  Go ahead.

21       A.   I don't have direct recollection what the

22   email response was, okay?  I don't have it in front

23   of me.  I don't remember.

24       Q.   I understand.  Was that an email that was

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
 1    sent to you, or was it an email sent to somebody

 2    else?

 3         A.   I don't recall.  I'm pretty sure -- I

 4    don't know for sure.  I'd have to go back and look.

 5         Q.   Any other instances that you can recall

 6    any specific issues with Alex, between you and Alex,

 7    not anybody else, you and Alex?

 8         A.   No.

 9         Q.   All right.

10              Hey Taylor, give me about five minutes, if

11    you would, please.

12                        (Short recess after which the

13                        following proceedings were had.)

14              MR. BAKER:  Going back on the record, I

15    have no further questions for Mr. Crawford.

16    Mr. Crawford, Miss Traynoff has the opportunity to

17    ask you some questions now so she very well might do

18    that, but I don't have anything more, so thank you,

19    sir.

20              THE WITNESS:  You're welcome.

21              MS. TRAYNOFF:  Okay, Mr. Crawford.  I just

22    have a few questions.

23

24
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
 1                      EXAMINATION

 2                          BY

 3                    MS. TRAYNOFF:

 4        Q.    So, in 2016, you were not Mr. Kedas'

 5   direct supervisor, is that correct?

 6        A.    That's correct.

 7        Q.    You would have been, I guess, the direct

 8   supervisor of Jason Smith, is that accurate?

 9        A.    That's correct.

10        Q.    Did you have any responsibilities, then,

11   in 2016 and then the subsequent years, years that

12   are following, have any responsibility in jobs or

13   project assignments?

14        A.    I did not.  For Jason Smith and Greg

15   Robinson, I did not tell them who to decide for what

16   job.  If they came to me and asked for advice, I

17   would give them advice, but it is part of my job if

18   they ask.  I had my own job assignments to take care

19   of in the western part of the district, so, I made

20   those job assignments.  It was not related to

21   Mr. Smith or Mr. Robinson, it was my acting duty as

22   a Supervising Construction Field Engineer.

23        Q.    Okay.  Do you recall at any point

24   Mr. Smith coming to discuss possibilities of a
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1     signing of a project to Mr. Kedas?

2          A.   Mr. Smith came to me in 2017 -- no, excuse

3     me, 2018 and told me who he was going to assign to

4     what projects.

5          Q.   And then part of that discussion involved

6     the mention of Mr. Kedas, then?

7          A.   Yes, because Mr. Kedas was assigned to

8     Jason Smith.

9          Q.   Okay.  And do you recall in that

10    conversation Mr. Smith ever saying that he was not

11    going to assign Mr. Kedas a job because of a

12    complaint he filed in 2016 that alleged, I guess,

13    gender discrimination or preference to job

14    assignments to Andrea Childers?

15         A.   No, he did not.

16         Q.   And, I believe in your response to some of

17    Mr. Baker's question, you testified about an

18    incident, I hope I can get this right, it was about

19    the number of police that Mr. Kedas had on the

20    number of police that were present on a job, is that

21    accurate?  If I'm incorrect, you can go ahead and

22    correct me?

23         A.   In general, that's correct.

24              We have a contract with the Illinois State

Page 24

1   Police where we will call back troopers on overtime

2   hours to patrol our work zones, and the field

3   engineer is responsible for assigning the number of

4   hours.

5        Q.   And as you recall, Mr. Kedas had an issue

6   with the number of hours the officers were present;

7   is that accurate?

8        A.   He wanted more officers which, yes, it was

9   directly related to the number of hours because we

10   would have had to schedule more hours for more

11   officers.

12        Q.   And he sent an email to someone, is that

13   right?  Is that how that worked?

14        A.   He sent an email to Jason Smith that

15   stated that he believed we need more, I'm not sure

16   exactly what it said, and then Jason Smith responded

17   this is how I came up with that number and if you

18   would like to have an internal conversation, then we

19   can.  And then Alex responded back, I'm not exactly

20   sure what the email said, but to the effect that we

21   need more.  And other people that are not internal

22   were included on the email.

23        Q.   Do you recall if any discipline ever

24   resulted from Mr. Kedas as a result of that

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

```
1    incident?
2         A.   Yes.
3         Q.   Do you recall what kind of, what kind of
4    discipline it was?
5         A.   I would just say progressive discipline
6    because there's a -- I'm not sure if it was AN oral
7    reprimand or verbal reprimand -- excuse me, a
8    written reprimand.  I can not recall.
9         Q.   Okay.  Did you have any role in
10   recommending that discipline?
11        A.   Jason documented what had happened and
12   asked me if I agreed, I said I agree.  And then we
13   submitted it to the Bureau of Administration for
14   their approval.
15        Q.   Do you recall what year that was in?
16        A.   I believe it was in 2017.
17             MS. TRAYNOFF:  I have no further
18   questions.
19             MR. BAKER:  Okay.  I have no further
20   questions.
21             Taylor, you want to go ahead and explain
22   waiver?
23             MS. TRAYNOFF:  Okay, Mr. Crawford, so, at
24   this point now you could either authorize your
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

Kenneth Crawford
February 17, 2022

**EXHIBIT 3**

1    signature for the transcript and therefore certify

2    it, or if you withhold your signature at this time,

3    you'll get a chance to review the transcript of your

4    testimony.  So, the court reporter will send you a

5    copy of the transcript.  I'll get it to you, and

6    you'll be able to review the recording of your

7    testimony, see if there were any errors that were

8    recorded and those are not substantive errors, so,

9    it wouldn't be the opportunity to change your

10   testimony from a "yes" to a "no," something like

11   that, but more of just maybe someone's name was

12   incorrect or maybe the testimony was recorded as

13   "she" instead of "he," something like that.

14           And then at that point, after you've

15   reviewed it and recorded those changes on the

16   provided sheet that you will get also, you'll be

17   able to sign it at that point certifying the

18   transcript.  You'll get it back to me, and I'll get

19   it to the court reporter and she'll certify it.

20           THE WITNESS:  I would like to take a look

21   at it, please.

22           MS. TRAYNOFF:  Okay.

23           MR. BAKER:  Okay.  Thank you, sir, you are

24   done, so thank you very much for your testimony this

Atkinson-Baker, A Veritext Company
(818) 551-7300              www.veritext.com

1     afternoon.  Be safe and be careful out there.  I

2     don't know what it's like over where you are, but

3     here we've got some snow.  So, I'm sure IDOT is

4     going to be busy today.

5             MS. TRAYNOFF:  I'll take the same copy or

6     same order.  The full and then the condensed copy

7     sent to my email.  And I'll do the same order as

8     well.

9                         (Which were all the proceedings

10                          had in the above-entitled

11                          cause.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Page  28

**EXHIBIT 3**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                      URBANA DIVISION
 3
 4
 5      ALEX KEDAS,                    )
                                       )
 6              Plaintiff,             )
                                       )
 7              -v-                    )No. 19-cv-2113
                                       )
 8      ILLINOIS DEPARTMENT OF         )
        TRANSPORTATION.                )
 9                                     )
                Defendant.             )
10
11
12
                I, Pamela C. Taylor, CSR/RPR of the State
13      of Illinois, do hereby certify that I reported in
        machine shorthand the proceedings had at the
14      deposition in the above-entitled cause, and that
        this transcript is a true and accurate transcription
15      of my machine shorthand notes so taken to the best
        of my ability.
16
17
18
        CSR #084-001184
19
20      Dated this 3rd day
21      of March, 2022
22
23
24
```

Page 29

1                    SIGNATURE PAGE

2            I, KENNETH CRAWFORD, have read the

foregoing transcript of my deposition taken on

3    February 17, 2022, and, except for any corrections

noted below, it is a true and correct transcript of

4    my deposition given on the date aforesaid.

5

6                        CORRECTIONS BASED ON ERRORS

7                        IN REPORTING OR TRANSCRIPTION

8

9

10

11

12

13

14

15    _____

16                        KENNETH CRAWFORD

17

18    STATE OF ILLINOIS  )

      COUNTY OF C O O K  )

19    SUBSCRIBED AND SWORN TO

      Before me this _____ day of

20    _____, A.D., 2022

21    _____

22          Notary Public

23

24

                                    Page 30

**EXHIBIT 3**

```
 1    MS. TAYLOR TRAYNOFF

 2    taylor.traynoff@ilag.gov

 3                                    March 3, 2022

 4    RE: ALEX KEDAS vs. ILLINOIS DEPARTMENT OF TRANSPORTATION

 5    2/17/2022, KENNETH CRAWFORD (#5090354)

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                www.veritext.com

1    _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, notating the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 32

**EXHIBIT 3**

```
1   ALEX KEDAS vs. ILLINOIS DEPARTMENT OF TRANSPORTATION

2   KENNETH CRAWFORD (#5090354)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____   _____

24  KENNETH CRAWFORD                    Date

25
```

Page 33

[& - behalf]

| & | | | |
|---|---|---|---|

**&**   2:3 31:23 32:9

**0**

**084-001184**   1:17
29:18

**1**

**1**   4:22 32:1
**13177**   29:18
**17**   1:11 30:3
**19**   1:6 29:7
**1997**   11:9
**1:00**   1:12
**1st**   11:2

**2**

**2/17/2022**   31:5
**2000**   10:22
**2008**   10:22,23
**2009**   10:24
**2013**   11:3,3
**2014**   10:13
**2015**   11:16,17,18
12:14
**2016**   16:12 17:17
18:19 23:4,11
24:12
**2017**   10:14 24:2
26:16
**2018**   24:3
**2022**   1:11 29:21
30:3,20 31:3
**2025.520**   31:9,12
**2113**   1:6 29:7
**217**   2:5,11
**23**   3:8
**2nd**   2:10

**3**

**3**   7:8 31:3
**30**   32:1

**3rd**   29:20

**4**

**4**   3:7 8:5
**415**   2:4

**5**

**5**   7:2,10,14,24 8:1
8:4
**500**   2:10
**5090354**   31:5 33:2
**522-3445**   2:5

**6**

**60**   8:20
**62701**   2:4
**62704**   2:10

**7**

**782-1090**   2:11

**a**

**a.d.**   30:20
**ability**   4:17 29:15
**able**   27:6,17
**accurate**   23:8
24:21 25:7 29:14
**accusation**   19:19
**accusations**   18:9
**acting**   10:12,22
11:2 12:6 23:21
**activities**   9:12
**administration**
26:13
**advice**   23:16,17
**aforesaid**   30:4
**afternoon**   4:7 28:1
**agency**   8:14
**ago**   6:11 15:17,18
**agree**   26:12
**agreed**   26:12
**ahead**   21:15,20,20
24:21 26:21

**alex**   1:4 11:10
12:24 13:11,12,15
13:21 14:8 15:9
17:5,9,17,24 18:5
18:8,19 19:22,24
20:16,19,21 21:5,7
22:6,6,7 25:19
29:5 31:4 33:1
**alex's**   15:13 16:12
17:18
**alleged**   24:12
**allocated**   17:6
**allow**   5:3,6
**andrea**   17:19,20
17:22 18:1,9,20
19:1 24:14
**answer**   4:16 5:5,6
5:9
**answers**   5:11,15
**anybody**   7:23 20:5
22:7
**apologize**   15:15
20:12
**appearances**   2:1
**appeared**   2:6,12
**appearing**   31:18
32:7
**appears**   5:4
**approval**   26:14
**approximately**
8:17,19
**approximation**
8:20
**april**   10:13,15
**area**   11:19
**arguing**   12:24
15:5 21:2,7
**argument**   13:20
13:23,24 14:4
**arguments**   13:2,5
14:10

**arrange**   6:8
**asked**   5:4,19,20
11:1 15:5 17:3,7,7
18:5 21:11 23:16
26:12
**asking**   4:11,15
21:16
**assign**   24:3,11
**assigned**   11:17
12:1 15:24 24:7
**assigning**   25:3
**assignments**   17:22
19:3 23:13,18,20
24:14
**assistant**   2:9
**assumed**   12:6
**attended**   19:24
**attention**   19:9
21:4
**attorney**   2:8,9
**audible**   5:11
**authorize**   26:24
**avenue**   21:10
**avoid**   4:22 5:15,15
**aware**   14:11

| b | | | |
|---|---|---|---|

**b**   32:1
**back**   22:4,14 25:1
25:19 27:18
**background**   11:5
**bad**   6:6
**baker**   2:3,3,3 3:7
4:6,11 22:14
26:19 27:23
**baker's**   24:17
**based**   6:10 30:6
**bbbklegal.com**   2:5
**becoming**   12:20
**began**   10:12
**behalf**   2:6,12

Page 1

[believe - directed]

| | | | d |
|---|---|---|---|

**believe** 11:16
12:11 16:10,11,14
17:3,11,23 24:16
26:16
**believed** 19:1
25:15
**best** 4:17,21 29:15
**big** 8:23
**billed** 8:15
**bit** 4:18
**blank** 17:14
**break** 6:3,4
**briefly** 8:8
**brought** 19:8 21:4
**build** 8:16
**bureau** 6:21,22
7:15,16,18,20 8:7
8:9,10,18,24 21:12
21:13 26:13
**bureaus** 7:14
**busy** 28:4

**c**

**c** 1:17 29:12 30:18
**ca** 31:9,12,20
**call** 21:17 25:1
**callback** 17:6
**called** 1:14 13:13
**calls** 13:16
**care** 23:18
**careful** 28:1
**carnahan** 9:18,21
10:3 11:22 12:23
13:1,6,17,24 14:11
15:9,12 18:21
19:2,14,15 21:2
**carnahan's** 15:12
**cause** 28:11 29:14
**ccp** 31:9,12
**central** 1:1 29:1
**certain** 16:14

**certainly** 20:13
**certify** 27:1,19
29:13
**certifying** 27:17
**chance** 27:3
**change** 27:9 33:4,7
33:10,13,16,19
**changes** 27:15
**charge** 6:21
**chief** 7:18 17:10
**chiefs** 7:20
**childers** 17:19,20
17:23 24:14
**civil** 10:20 11:6
31:19,20
**clear** 4:23 5:23
**close** 21:10,15
**code** 31:9,12,19,20
**come** 6:7 12:5
**coming** 23:24
**commissioned**
1:18
**comparable** 7:21
11:21,22
**complained** 13:13
**complaint** 13:19
14:8 20:16 24:12
**complaints** 12:21
16:4
**completed** 31:7,17
32:6
**completion** 32:10
**comply** 21:5
**concern** 18:19
**concerns** 16:4,23
17:18 21:1,3
**condensed** 28:6
**condition** 21:11,16
**conference** 1:19
**confirm** 21:12

**confused** 16:9
**construction** 6:23
8:12 9:8,9,12
10:20,23 11:2
21:13 23:22
**contact** 31:9
**contract** 21:9
24:24
**conversation** 6:10
17:8 18:24 20:6
24:10 25:18
**conversations**
4:19
**copy** 27:5 28:5,6
**correct** 9:22 10:8
11:23 23:5,6,9
24:22,23 30:3
**corrections** 30:3,6
31:14,15 32:3,4
**counsel** 17:10
31:18,21 32:7
**counseling** 18:7
**county** 30:18
**couple** 4:19
**court** 1:1 4:24
27:4,19 29:1
**crawford** 1:11 3:4
4:1,9,10 22:15,16
22:21 26:23 30:2
30:16 31:5 33:2
33:24
**criticisms** 12:21
16:4
**csr** 1:17 29:12,18
**current** 6:16 10:11
10:16
**currently** 6:12 7:7
10:7 11:21 15:23
**cv** 1:6 29:7

**d** 3:1
**dangerous** 21:11
21:16
**date** 20:4 30:4
31:16 32:5 33:24
**dated** 29:20
**davis** 11:17,17,19
11:20 12:2
**day** 9:12,12 14:6
29:20 30:19
**deal** 14:7
**dealing** 13:17
**dealings** 13:16
**december** 12:12
**decide** 23:15
**decision** 14:19,24
15:6 18:6
**defendant** 1:8
2:12 29:9
**degree** 11:6,8
**department** 1:7
29:8 31:4 33:1
**deposed** 4:2
**deposition** 1:11
4:12 29:14 30:2,4
31:19,22,24 32:8
32:10
**depositions** 1:16
**describe** 8:8
**described** 14:14
**determined** 31:18
31:22 32:7
**devan** 4:9
**develop** 4:23
**development** 7:16
**different** 4:18 6:13
**direct** 11:11,13
12:9 21:21 23:5,7
**directed** 21:14

**[directives - holds]**

directives 21:4,7
directly 9:3 25:9
disagreements 20:21
discipline 15:10 16:16 25:23 26:4 26:5,10
discovery 1:16
discrimination 24:13
discuss 19:15 23:24
discussed 19:13,16 19:20 20:9,18,24 21:3
discussion 19:23 24:5
discussions 17:18
disputes 20:21
district 1:1,1 7:1,2 7:10,14,24 8:1,4,4 8:12 10:1 13:14 23:19 29:1,1
divided 6:22
division 1:2 29:2
documentation 16:20 19:22
documented 26:11
doing 4:15
dollars 8:11
drawing 17:14
duly 4:2
duties 16:6
duty 23:21

**e**

e 3:1 31:9,12 32:1 33:3,3,3
earlier 9:1,2
educational 11:4
effect 25:20

eight 10:15
either 14:12 26:24
email 17:2,9 21:16 21:22,24 22:1 25:12,14,20,22 28:7
emails 17:2
employed 9:24
engaged 4:18
engineer 6:18 7:8 8:2 9:9 10:5,20,21 10:23 11:2 23:22 25:3
engineering 11:6
entitled 28:10 29:14
errata 31:14,16 32:3,5
errors 27:7,8 30:6
evaluation 14:17 14:21 15:3
exactly 13:21 16:11 19:7 25:16 25:19
examination 3:3 4:4 23:1
excuse 12:12 16:17 24:2 26:7
exhibits 3:11
explain 6:19 14:23 19:5 26:21
expressing 18:19

**f**

fact 18:12
fair 6:14 10:1 12:7 12:14
far 21:6
favorable 19:2
february 1:11 30:3

federal 8:11 9:10 32:1,8,9
field 9:8 10:4,23 11:19 23:22 25:2
fifty 8:20
filed 24:12
fill 12:5
fine 17:15 21:20
finished 12:11
first 4:2
fitness 14:17,20 15:3
five 22:10
fluctuate 8:18
follow 4:20
following 22:13 23:12
follows 4:3 31:8
foregoing 30:2
forwarded 17:9
frcp 32:1
frequently 12:24
front 21:22
full 4:8 5:5 10:13 10:24 28:6
fully 5:3,9
fund 8:11
funds 9:10
further 22:15 26:17,19

**g**

gar 16:17
garnet 8:3 14:22 14:23 17:17 20:15
garnett 7:5,6 8:1 19:17,23 20:7
gender 24:13
general 2:8,9 16:8 24:23
george 11:17,17 11:19

give 5:5 15:11 19:2 22:10 23:17
given 18:20 21:5 30:4
giving 21:6
go 4:19 21:15,20 21:20 22:4 24:21 26:21
goal 5:14
going 4:11,15 5:2 6:3 15:19 20:11 22:14 24:3,11 28:4
good 4:7 5:12
grades 8:15
greg 23:14
grunts 5:12
guess 16:21 18:1,1 19:12 20:23 23:7 24:12

**h**

h 33:3
half 12:14
handed 19:12
handled 31:8
happen 13:18
happened 13:12 15:17 17:11 26:11
hard 5:13,17
hats 6:13
heard 12:21,23 13:7 14:12
heated 14:5
held 10:18 11:20
help 15:5
helping 9:11
hey 22:10
hold 7:7 8:22 10:3 11:23
holds 10:7 11:22 15:23

Atkinson-Baker, A Veritext Company
(818) 551-7300                                    www.veritext.com

**EXHIBIT 3**

**[homeowner - o]**

**homeowner** 13:11
13:13,13,16,17
14:8
**hope** 24:18
**hours** 17:6 25:2,4
25:6,9,10
**huh** 5:13

**i**

**idot** 6:6,12,17 9:22
10:19 28:3
**ilag.gov** 2:11 31:2
**illinois** 1:1,7,19
2:4,8,10 11:7
24:24 29:1,8,13
30:18 31:4 33:1
**imagine** 7:17
**immediate** 7:3
12:17 15:13 20:20
**immediately** 12:5
**implementation**
6:18,22 8:8,10
**important** 5:1
**inappropriate**
17:1
**incident** 24:18
26:1
**included** 17:2
25:22 31:14 32:3
**including** 17:10
**incorrect** 24:21
27:12
**individuals** 9:15
**information** 19:10
**inspector** 10:21
**instance** 17:4
**instances** 17:1
22:5
**instructed** 13:15
**internal** 17:8,10
25:18,21

**interrupted** 21:19
**interrupting** 5:8
**interviewed** 10:24
**investigated** 18:10
18:12,13
**investigation**
18:16
**investigatory**
18:15
**involved** 18:16
24:5
**involving** 16:17
**issue** 19:23 25:5
**issued** 15:9
**issues** 16:17,19,22
20:19 21:1 22:6

**j**

**jab** 2:5
**january** 10:13
11:2 12:12
**jason** 9:6 17:3,7
23:8,14 24:8
25:14,16 26:11
**job** 6:16 8:13 9:7,7
9:15 10:6 12:22
13:11 16:6 17:6
17:21 18:1 19:2
23:16,17,18,20
24:11,13,20
**jobs** 8:15 23:12
**john** 2:3 4:10
**july** 11:18

**k**

**k** 30:18
**kedas** 1:4 11:10
12:1,10,18,21 13:6
14:11,17,20 15:22
15:24 16:5,18
23:4 24:1,6,7,11
24:19 25:5,24

29:5 31:4 33:1
**kenneth** 1:11 3:4
4:1,9 30:2,16 31:5
33:2,24
**kensil** 7:5 8:1
14:22 15:4 18:5,8
18:11
**kind** 20:21 26:3,3
**know** 5:2,7,20 6:5
8:18 9:5 13:14,21
14:9,19 15:2,4,6
15:19 16:16,20
17:11 18:12 19:12
19:16,18,19 20:3
20:15,17 22:4
28:2
**knowledge** 13:5,8
**krajewski** 2:3
**kwame** 2:8

**l**

**lead** 15:7
**legal** 31:7
**license** 1:17
**line** 31:15 32:4
33:4,7,10,13,16,19
**little** 4:17 6:11
8:18
**live** 8:15
**local** 6:22 8:14
**locked** 31:12 32:1
**long** 6:4 10:10
12:9 15:17
**look** 22:4 27:20
**looking** 7:9
**lot** 5:24 15:17,18

**m**

**machine** 29:13,15
**manipulate** 19:2
**manipulation** 19:5

**march** 16:11
29:21 31:3
**materials** 6:23
8:13
**mean** 9:19 16:7
**meeting** 17:16,20
18:4,7 19:24 20:3
**memorialized**
5:15
**mention** 24:6
**mike** 9:18 12:23
13:10,15,17,20
15:4 18:9 19:2
**minutes** 22:10
**month** 11:1

**n**

**n** 3:1
**name** 4:8,10 9:18
27:11
**nature** 13:2
**necessarily** 20:10
**necessary** 31:14
32:3
**need** 4:22 6:4,6
25:15,21
**never** 18:15 19:12
**nonverbal** 5:15
**normal** 4:18
**nos** 5:11
**notary** 1:18 30:22
**notating** 31:15
32:4
**noted** 30:3
**notes** 29:15
**number** 6:13 17:5
24:19,20 25:3,6,9
25:17 31:15 32:4

**o**

**o** 30:18,18

Page 4

**[observation - requested]**

**observation** 14:12
**occur** 20:2 21:8
**office** 31:11
**officers** 25:6,8,11
**okay** 4:15 5:9 6:8
  6:16 11:4,20 13:4
  14:10 16:3 17:24
  18:1 20:2,5 21:22
  22:21 23:23 24:9
  26:9,19,23 27:22
  27:23
**once** 12:4
**operations** 7:15
**opportunity** 5:6,8
  22:16 27:9
**oral** 18:7 26:6
**order** 28:6,7
**organization** 7:10
  7:24
**original** 31:10,21
**overall** 12:22
**overseeing** 8:11
  9:11
**overtime** 25:1

**p**

**p.m.** 1:12
**page** 5:24 30:1
  31:15 32:4 33:4,7
  33:10,13,16,19
**pages** 31:14,17,17
  32:3,6,6
**pamela** 1:17 29:12
**part** 23:17,19 24:5
**particular** 6:24
  14:7 18:3
**patrol** 25:2
**pdf** 31:12 32:1
**penalty** 31:16 32:5
**people** 8:17 17:9
  25:21

**performance**
  12:22
**performed** 12:18
**performing** 16:5
**period** 11:12
  12:16 15:8 16:15
  31:18 32:7
**perjury** 31:17
  32:6
**personal** 16:22
**personally** 20:20
**pertaining** 1:15
**phone** 21:17
**plaintiff** 1:5,14 2:6
  29:6
**please** 4:7 5:7,20
  6:7 22:11 27:21
**point** 6:4 11:10,13
  11:18 14:16 15:21
  18:18 23:23 26:24
  27:14,17
**police** 17:6 24:19
  24:20 25:1
**position** 6:20 7:6
  7:21 9:7 10:3,11
  10:12,16 11:21
  12:5 15:23 16:15
**positions** 7:13
  10:18
**possibilities** 23:24
**preference** 24:13
**preferential** 18:20
**present** 19:24 20:6
  24:20 25:6
**pretty** 22:3
**prior** 12:20 20:3
**probably** 6:2
**problems** 12:17
  16:23 21:1,3
**procedure** 31:19
  31:20

**proceedings** 22:13
  28:9 29:13
**program** 7:16
**progressive** 26:5
**project** 6:18,21
  8:8,10,23 23:13
  24:1
**projects** 8:12 9:10
  9:13 24:4
**promoted** 10:13
  15:23
**prospect** 21:10
**provided** 27:16
  31:19 32:8
**public** 1:18 30:22
**purpose** 1:16
**put** 8:13

**q**

**qualified** 1:18
**question** 5:2,3,6,9
  18:5 24:17
**questioning** 17:5
  17:21,24
**questions** 4:11,16
  22:15,17,22 26:18
  26:20
**quickly** 4:20

**r**

**r** 33:3,3
**r&s** 32:1,9
**raoul** 2:8
**read** 13:7 14:13
  30:2
**reading** 31:23
  32:9
**real** 4:20
**reason** 6:5 33:6,9
  33:12,15,18,21
**recall** 14:3,16
  15:10,16,24 16:4

16:20,24 17:13,16
  17:22 18:3,8,18,23
  19:7,11,13 20:9,22
  21:8 22:3,5 23:23
  24:9 25:5,23 26:3
  26:8,15
**recess** 22:12
**recipients** 17:2
**recognize** 15:17
**recollection** 16:22
  21:21
**recommending**
  26:10
**record** 4:24 5:4
  22:14
**recorded** 27:8,12
  27:15
**recording** 27:6
**referenced** 31:6
**referring** 9:6
**region** 6:24 7:8
**regional** 8:2
**related** 23:20 25:9
**released** 31:21
**remember** 14:5,6
  14:9,15 15:14
  18:2 19:20 20:8
  20:11,13,13 21:23
**remind** 5:17
**report** 11:11,13
  18:15
**reported** 29:13
**reporter** 4:24 27:4
  27:19
**reporting** 30:7
**reports** 9:2
**reprimand** 26:7,7
  26:8
**requested** 32:1,9
  32:10

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

[resident - times]

| | | | |
|---|---|---|---|
| **resident** 10:21 | **sense** 8:23 16:19 16:21 | **someone's** 27:11 | **sure** 5:7,14,22,22 8:14 11:1 17:11 21:17,19 22:3,4 25:15,20 26:6 28:3 |
| **responded** 25:16 25:19 | **sent** 14:17,20 15:2 19:19,22 21:16 22:1,1 25:12,14 28:7 | **sorry** 10:10 11:16 15:14 16:8 17:14 20:11 21:19 | |
| **response** 19:9 21:22 24:16 | | **sort** 15:10 20:18 | |
| **responsibilities** 8:4 9:7,16 23:10 | **series** 4:16 | **speak** 13:15 | **sworn** 4:2 30:19 |

**t**

| | | | |
|---|---|---|---|
| **responsibility** 8:9 23:12 | **serve** 12:9 | **speaking** 4:22 | **t** 33:3,3 |
| **responsible** 8:11 9:9,11 25:3 | **seventh** 2:4 | **specific** 16:7 21:6 22:6 | **table** 7:9,24 |
| | **she'll** 27:19 | **specifically** 17:5 | **take** 6:2,3 12:6 23:18 27:20 28:5 |
| **result** 25:24 | **sheet** 27:16 | **specifications** 8:16 | **taken** 1:19 4:12 29:15 30:2 |
| **resulted** 25:24 | **short** 22:12 | **speculate** 20:11 | **talked** 8:7 |
| **retired** 9:22 11:18 12:4 | **shorthand** 29:13 29:15 | **spoke** 9:1 13:14 21:12 | **talking** 16:8 |
| **return** 31:17 32:6 | **shoulders** 5:12 | **springfield** 2:4,10 | **taylor** 1:17 2:9 22:10 26:21 29:12 31:1 |
| **review** 14:17,20 15:3 27:3,6 31:8 31:10,13 32:2 | **shrugs** 5:12 | **state** 1:19 4:8 24:24 29:12 30:18 31:9,12 | |
| | **sidewalk** 21:10,15 | | **taylor.traynoff** 2:11 31:2 |
| | **sign** 27:17 31:16 32:5 | **stated** 25:15 | **tell** 13:1 23:15 |
| **reviewed** 27:15 | **signature** 27:1,2 29:18 30:1 31:21 31:23,23 32:9 | **states** 1:1 29:1 | **terribly** 6:3 |
| **right** 4:10 7:13 14:10 19:4 22:9 24:18 25:13 | | **step** 6:7 | **testified** 4:2 24:17 |
| | **signing** 24:1 | **stipulation** 31:20 | **testimony** 27:4,7 27:10,12,24 |
| **roads** 6:23 | **sir** 4:7,13,14 5:10 6:9,15 7:12,15,19 7:22 8:6 9:4,17,20 9:23 10:2,9,17 11:24 12:3,8,15,19 16:2,13 22:19 27:23 | **street** 2:4,10 | **thank** 22:18 27:23 27:24 |
| **robinson** 23:15,21 | | **submitted** 26:13 | |
| **role** 8:9 12:6 26:9 | | **subordinate** 11:12 | **thing** 5:18 |
| **rpr** 1:17 29:12 | | **subpoena** 1:15 | **things** 5:13 15:17 15:18 |
| **rules** 4:20 32:8 | | **subscribed** 30:19 | **think** 6:3 20:22 |

**s**

| | | | |
|---|---|---|---|
| **s** 2:4,10 33:3 | **sit** 7:10 | **subsequent** 23:11 | **time** 5:5 6:4 10:13 10:24 11:10,12,13 12:16 14:16 15:8 15:11,21 16:16 17:23 18:18 19:18 21:9 27:2 31:10 31:18,24 32:7 |
| **safe** 28:1 | **smith** 6:10 9:2,5,6 9:6 10:7 11:21 15:22 16:3,12,18 17:17 21:3 23:8 23:14,21,24 24:2,8 24:10 25:14,16 | **substantive** 27:8 | |
| **safety** 21:12 | | **supervise** 15:24 | |
| **saw** 18:15 | | **supervising** 23:22 | |
| **saying** 5:1 18:11 24:10 | | **supervision** 15:22 | |
| **schedule** 25:10 31:10 | | **supervisor** 7:4 12:10,17,20 15:9 15:12,13 16:12 18:6 23:5,8 | |
| **search** 10:4 | **snow** 28:3 | | **timeframe** 16:8 |
| **see** 27:7 | **solutions** 31:7 | **supervisors** 20:20 | **times** 5:24 |
| **send** 27:4 | **somebody** 13:7 14:13 22:1 | **supervisory** 9:8 10:4,23 | |
| | | **supposedly** 21:5 | |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

Kenneth Crawford
February 17, 2022

**EXHIBIT 3**

[title - zoom]

| | | |
|---|---|---|
| **title** 6:16 9:15 10:7 | **urbana** 1:2 29:2 | **yesses** 5:11 |
| **today** 4:12 28:4 | **v** | **z** |
| **told** 9:1 13:10,24 | | |
| 18:8 21:13 24:3 | **v** 1:6 29:7 | **zones** 25:2 |
| **top** 7:11 | **verbal** 26:7 | **zoom** 1:19 |
| **transcript** 27:1,3,5 | **verbally** 18:19 | |
| 27:18 29:14 30:2 | **veritext** 31:7,9,11 | |
| 30:3 31:6,8,10,13 | **vs** 31:4 33:1 | |
| 31:13,21 32:2,2 | **w** | |
| **transcription** | | |
| 29:14 30:7 | **waived** 31:23,23 | |
| **transportation** 1:7 | **waiver** 26:22 | |
| 29:8 31:4 33:1 | **waiving** 31:20 | |
| **traynoff** 2:9 3:8 | **want** 4:16,19,23 | |
| 22:16,21 23:3 | 5:7,22 26:21 | |
| 26:17,23 27:22 | **wanted** 25:8 | |
| 28:5 31:1 | **way** 16:5 19:6 | |
| **treatment** 18:20 | **we've** 4:24 28:3 | |
| **troopers** 25:1 | **wear** 6:13 | |
| **true** 29:14 30:3 | **weather** 6:6 | |
| **try** 5:16 | **welcome** 22:20 | |
| **trying** 8:22,22 | **went** 15:4 | |
| 15:20 16:18,21 | **western** 23:19 | |
| 19:1 20:23 | **withhold** 27:2 | |
| **two** 9:14,15 16:23 | **witness** 1:14 3:3 | |
| **type** 19:4 | 13:3 22:20 27:20 | |
| **types** 9:16 | 31:13,16 32:2,5 | |
| **u** | **witnessed** 13:4,9 | |
| | 14:1,2 | |
| **un** 5:13,13,13 | **work** 6:6,11 8:17 | |
| **understand** 5:19 | 12:2,18,22 25:2 | |
| 5:21 6:11,12 8:21 | **worked** 25:13 | |
| 8:21,23 9:2,14,21 | **working** 13:12 | |
| 11:11 20:13,24 | **written** 26:8 | |
| 21:24 | **x** | |
| **understanding** 8:3 | | |
| 16:10 | **x** 3:1 32:1 | |
| **unfit** 15:6 | **y** | |
| **united** 1:1 29:1 | | |
| **university** 11:7 | **year** 11:8 12:11,13 | |
| **upset** 20:15 | 26:15 | |
| | **years** 10:15 15:18 | |
| | 16:15 23:11,11 | |

Atkinson-Baker, A Veritext Company
(818) 551-7300
www.veritext.com

**EXHIBIT 3**

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions


**Ukipkpi"cpf"Hknkpi"Fgrqukvkqpu**

(a) Submission to Deponent; Changes; Signing.
Unless signature is waived by the deponent, the
officer shall instruct the deponent that if the
testimony is transcribed the deponent will be
afforded an opportunity to examine the deposition
at the office of the officer or reporter, or
elsewhere, by reasonable arrangement at the
deponent's expense, and that corrections based on
errors in reporting or transcription which the
deponent desires to make will be entered upon the
deposition with a statement by the deponent that
the reporter erred in reporting or transcribing the
answer or answers involved. The deponent may not
otherwise change either the form or substance of
his or her answers. The deponent shall provide the
officer with an electronic or physical address to
which notice is to be sent when the transcript is
available for examination and signing. When the
deposition is fully transcribed, the officer shall
deliver to the deponent, at the address supplied,

**EXHIBIT 3**

notice that it is available and may be examined at
a stated place at stated times, or pursuant to
arrangement. After the deponent has examined the
deposition, the officer shall enter upon it any
changes the deponent desires to make, with the
reasons the deponent gives for making them. If
the deponent does not appear at the place specified
in the notice within 28 days after the mailing of
the notice, or within the same 28 days make other
arrangements for examination of the deposition, or
after examining the deposition refuses to sign it,
or after it has been made available to the deponent
by arrangement it remains unsigned for 28 days, the
officer's certificate shall state the reason for
the omission of the signature, including any reason
given by the deponent for a refusal to sign. The
deposition may then be used as fully as though
signed, unless on a motion to suppress under Rule
211(d) the court holds that the reasons given by
the deponent for a refusal to sign require
rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing.
(1)If the testimony is transcribed, the officer

**EXHIBIT 3**

shall certify within the deposition transcript that

the deponent was duly sworn by the officer and that

the deposition is a true record of the testimony

given by the deponent.  A deposition so certified

requires no further proof of authenticity

(2) Deposition transcripts shall not be filed with

the clerk of the court as a matter of course.  The

party filing a deposition shall promptly serve

notice thereof on the other parties and shall

file the transcript and any exhibits in the

form and manner specified by local rule.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 3**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.