1          IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
2                    URBANA DIVISION

3

4    ALEX KEDAS,                        )
                                        )
5              Plaintiff,               )
                                        )
6              -v-                      )No. 19-cv-2113
                                        )
7    ILLINOIS DEPARTMENT OF             )
     TRANSPORTATION.                    )
8                                       )
               Defendant.               )
9

10

11          DEPOSITION OF KENSIL GARNETT
               February 17, 2022
12                  2:17 p.m.

13

14          Called as a witness by the Plaintiff
15    herein, through subpoena, pertaining to the taking
16    of depositions for the purpose of discovery before
17    PAMELA C. TAYLOR, CSR/RPR, License No. 084-001184, a
18    Notary Public qualified and commissioned for the
19    State of Illinois, taken via Zoom conference.

20

21

22

23

24
                                          Page 1

```
 1       APPEARANCES:

 2

 3               BAKER, BAKER & KRAJEWSKI,
                 BY:  MR. JOHN A. BAKER,
 4               415 S. Seventh Street
                 Springfield, Illinois, 62701
 5               (217)522-3445
                 jab@bbbklegal.com
 6               Appeared on behalf of the Plaintiff,

 7

 8               ILLINOIS ATTORNEY GENERAL,
                 MR. KWAME RAOUL,
 9               BY:  MS. TAYLOR TRAYNOFF,
                 Assistant Attorney General
10               500 S. 2nd Street
                 Springfield, Illinois 62704
11               (217)782-1090
                 taylor.traynoff@ilag.gov
12               Appeared on behalf of the Defendant.

13

14

15

16

17

18

19

20

21

22

23

24
```

Page  2

**EXHIBIT 4**

```
 1                        I N D E X

 2

 3      WITNESS:                      EXAMINATION

 4      KENSIL GARNETT

 5

 6

 7      Mr. Baker                         4

 8

 9

10

11                        E X H I B I T S

12

13      NONE

14

15

16

17

18

19

20

21

22

23

24

                                          Page  3
```

```
 1                    KENSIL GARNETT

 2    having been first duly sworn, deposed and testified

 3    as follows:

 4                    EXAMINATION

 5                        BY

 6                    MR. BAKER:

 7         Q.   All right, sir.  Good afternoon, sir.  My

 8    name is John Baker, and I represent Alex Kedas in a

 9    lawsuit that he has brought against the Illinois

10    Department of Transportation.  Would you please

11    state your full name?

12         A.   Kensil Garnett.  That's K-E-N-S-I-L,

13    middle initial A, last name G-A-R-N-E-T-T.

14         Q.   Mr. Garnett, have you ever had your

15    deposition taken before?

16         A.   It's been a long time, sir.

17         Q.   Okay.  All right.  Well, I'll just refresh

18    your memory as to some of the rules we like to

19    follow here in depositions.

20              Because we got a court reporter, we're

21    trying to keep an accurate record of what it is we

22    all say here today, so, you, even if you know a

23    question that I'm asking, allow me to get it out all

24    the way before you respond.  I'll try to do the
```

Page  4

**EXHIBIT 4**

1    same.  If at some point in time I don't let you

2    answer a question, let me know, and I'll make sure

3    that I do that, okay?

4          A.   Yes, sir.

5          Q.   Okay, answer questions audibly, "yes,"

6    "no," as opposed to a nod of the head or a shrug of

7    the shoulders.  Again, this is just so that we keep

8    an accurate record.

9               If you don't understand something that I

10   have asked, probably because I haven't asked it very

11   well, let me know, and I'll make sure that I clarify

12   the question for you.

13              I don't know that this is going to take

14   very long, but I do recognize that you're busy.  You

15   got things going on and might need a bathroom break.

16   If you need to take a break, let me know, and we

17   will certainly arrange for you to do so.  Okay?

18         A.   Yes, sir.

19         Q.   Okay.  I understand that you are currently

20   employed by the Illinois Department of

21   Transportation?

22         A.   Yes, sir.

23         Q.   And how long have you been employed by the

24   IDOT?

1          A.    I've worked for IDOT since May of 1991.

2          Q.    And what is the current position that you

3    hold with IDOT?

4          A.    I'm the current Region 3, Engineer, CE IX.

5          Q.    Now, you used the term CE IX, what does C

6    and E stand for?

7          A.    Civil Engineer.

8          Q.    So, I take it that you have an engineering

9    background of some sort?

10         A.    Yes, sir.  I have a degree from the

11   University of Illinois at Champaign Urbana and a

12   professional engineering license.

13         Q.    Now, as the Region 3 Engineer, what are

14   your job responsibilities?

15         A.    I am responsible for Districts 4 and 5,

16   District 4 being Peoria, which consists of 12

17   counties, and District 5, which consists of seven

18   counties.  And I'm responsible for the -- making

19   sure the program goes out, the construction jobs

20   that are built, and roads are maintained.

21         Q.    Now, do you have responsibility in

22   Districts 4 and 5 over the operations or the snow

23   removal or anything like that?

24         A.    The Operations Engineer, which is a CE-7

                                          Page  6

```
1      position reports -- they report directly to me.
2           Q.   Okay, so and that would be the snow
3      removal as well?
4           A.   Yes, sir.
5           Q.   A busy day for you today, isn't it?  I got
6      you on the worst possible day with what's going on
7      in central and eastern Illinois?
8           A.   I have received a lot of emails.  It
9      started earlier in District 4 in the Peoria area and
10     then Bloomington Normal this morning, and it's
11     making its way to Champaign.  So yes, it's been a
12     very -- rather busy day.
13          Q.   Well, like I said, I certainly don't want
14     to disrupt the operations of the Illinois Department
15     of Transportation.  If you need to take a call or
16     something, please let me know.  Making sure
17     everybody is safe, that's the most important.
18     Again, if you need to step way, please let me know.
19               So, in total, how many people do you
20     oversee out of District 4 and District 5?
21          A.   The head count in district, in District 5
22     is 299 and in District 4, it's close to 400, so,
23     you're looking at about 700 individuals.
24          Q.   And do you physically work out of -- as I
```

Page  7

1    understand District 5 is headquartered in Paris and

2    District 4 is headquartered in Peoria?

3         A.    Correct.

4         Q.    Do you have a physical office in both

5    locations or one or the other?

6         A.    I have a physical office in Peoria and a

7    physical office in Paris.

8         Q.    And what percentage of your time do you

9    spend in each one of those?

10         A.    I generally spend two days a week in

11    Peoria.  I like to start my week in Peoria, so, you

12    know, generally on Monday or Thursday or a Monday

13    and Wednesday, Monday and a Friday.  And then I try

14    to spend two days a week in Paris.  And then the

15    other day could be used sometimes meetings in

16    Springfield, things of that nature.

17              At this time of the year, it's been mostly

18    two days in Peoria and three days in Paris.

19         Q.    And who is, not necessarily name-wise, but

20    title-wise, who is your immediate supervisor?

21         A.    My immediate supervisor is the Director of

22    Highways.

23         Q.    How long have you been the Region 3

24    Engineer?

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

1          A.    I became the acting Region 3 Engineer
2    April 1st of 2014.
3          Q.    And what position did you hold before that
4    with IDOT?
5          A.    Prior to that, I was the District 5
6    Implementation Engineer, and prior to being the
7    implementation engineer, I was a District 5
8    Construction Engineer.
9          Q.    Was Alex Kedas ever under your immediate
10   supervision?
11         A.    He was never under my immediate
12   supervision, no, sir.
13         Q.    He was under some of your subordinates
14   under their immediate supervision, and they reported
15   up to you, is that correct?
16         A.    Yes, sir, that would be correct.  As the
17   construction engineer, the field engineers,
18   construction field engineers reported to me, and
19   Alex reported to the field engineer.
20         Q.    Did you ever personally have any issues
21   with the way Alex performed any of his job duties or
22   engaged in interactions with his coworkers?
23         A.    Yes, sir.
24         Q.    Okay, explain to me when you first began

                                              Page  9

**EXHIBIT 4**

1     having concerns about Alex?

2         A.   I began having concerns with Alex in

3     approximately 2008.  There were some grievances

4     filed.  Mr. Kedas filed a grievance with the

5     Department concerning ICORS and bookkeeping and

6     things of that nature, and we seemed to have an

7     issue every year.

8         Q.   Okay, when you say ICORS, what is that?

9         A.   That's the Illinois Construction

10    Management Record Systems for keeping jobs, keeping

11    the documentation for construction projects.

12        Q.   And you said, you seem to have an issue

13    every year.  What specifically did you mean by that?

14        A.   We had an issue with ICORS and Alex' not

15    having certain status that he thought he was being

16    singled out for, and there were other individuals

17    that had the same thing.  We had some issues -- we

18    had some issues with arguing with field engineer,

19    Mr. Carnahan.  We had an issue, some bookkeeping

20    issues with Andrea Childers.  We had some issues

21    with Jason Smith as well.

22        Q.   Okay, then, one of those that you

23    mentioned was singled out for something that applied

24    to other people as well.  And I might have

1       misunderstood you.  I was trying to take notes, but

2       I didn't take them quickly enough.

3               You mentioned something about Alex being

4       singled out, am I understanding that correctly?

5           A.   That is correct, sir.  For ICORS, he had

6       an issue with the fact that he didn't feel that he

7       had the permissions that other individuals had, and

8       there were other individuals that had -- individuals

9       that had bookkeepers had the same permissions that

10      he had.  He filed a grievance against the Department

11      for that.

12          Q.   Is that a union grievance?

13          A.   Yes, sir.

14          Q.   And, explain to me, and I'm, I'm not

15      familiar with ICORS, and I know you told me what the

16      acronym stood for.  Is that a, is that an external

17      body of some sort?

18          A.   It's actually, it's a database program,

19      and so that's where a resident engineer or resident

20      technician, that's where they type in the daily

21      diary for the job.  That's where they keep all the

22      construction records, IDRs.  That's where they do

23      the authorizations, pay estimates, things like that.

24      It's the construction record keeping system.

**EXHIBIT 4**

1      Q.   I understand.  So, it's a software that is
2  used to keep all the information, log all the
3  information?
4      A.   Yes, sir.
5      Q.   And, so, Alex' concern, the grievance that
6  he filed was, he believed he didn't have all the
7  permissions that other people were given to do
8  certain things?
9      A.   That is correct.
10      Q.   So, he filed a union grievance on that, is
11  that correct?
12      A.   Yes, sir.
13      Q.   You indicated there were issues with him
14  arguing with his field engineer, and that was
15  Mr. Carnahan, the first one, at least, that you
16  referenced?
17      A.   Yes, sir.
18      Q.   What do you remember about those
19  particular issues?
20      A.   Mr. Kedas did not accept criticism, or he
21  did not like instruction from Mr. Carnahan.  And,
22  so, it would get to the point, just arguments.
23      Q.   Now, did you observe these arguments or
24  were you told about these by Mr. Carnahan?

Page 12

**EXHIBIT 4**

1          A.    I was told about them from Mr. Carnahan.

2          Q.    Did you ever observe any of these

3    arguments?

4          A.    I did observe arguments.  On one occasion,

5    we had had a meeting about an issue, and the meeting

6    was prepared with, you know, sort of an agenda.

7    Alex was able to go through his concerns with

8    Mr. Carnahan; Mr. Carnahan sat there and listened to

9    him berate him.  And then when Mr. Carnahan began to

10   go through his list of concerns, Mr. Kedas kept

11   interrupting him.

12         Q.    Do you recall when that occurred?

13         A.    I do not.  I do not, sir.

14         Q.    But you were present for that?

15         A.    If I find the information to you, I

16   request it.

17         Q.    You were present for that particular

18   incident?

19         A.    Yes, sir, I was.

20         Q.    Now, at some point in time, Mr. Kedas was

21   referred for fitness review evaluation?

22         A.    Correct.

23         Q.    And, was that at your direction?

24         A.    That was at my direction, yes, sir.

**EXHIBIT 4**

1      Q.    Okay, why did you, why did you make that

2   direction?

3      A.    I made that direction because we were

4   having issues with, with the arguments, with the

5   field engineer not accepting supervision, and issues

6   with other employees, issues with contractors.

7      Q.    Did you ever speak to any contractors

8   personally who told you about issues they had with

9   Alex?

10      A.    Yes, sir.

11      Q.    Okay, tell me about those instances.

12      A.    It was requested in order to do the fit

13   for duty, I had to have statements from those

14   contractors.  I received statements from those

15   contractors.

16      Q.    Did you receive them because you requested

17   them?

18      A.    I received them because I requested them,

19   but I also had conversations with contractors in the

20   past of the issues with Mr. Kedas.

21      Q.    Who told you that you needed to get

22   statements from the contractors if you wanted to do

23   a fitness?

24      A.    That comes from central office in

```
 1       Springfield.
 2            Q.    Do you recall who specifically told you
 3       that?
 4            A.    Marie Malek-Robinson.
 5            Q.    And what position does she hold?
 6            A.    She was the statewide EAP coordinator.
 7            Q.    And EAP is Employee Assistance Program?
 8            A.    Yes, sir.
 9            Q.    Do you recall which contractors she
10       reached out?
11            A.    Open Road Paving, Stark Excavating.
12            Q.    So, you identified Open Road Paving and
13       Stark Excavation?
14            A.    Yes, sir.
15            Q.    Had you previously spoken with both of
16       them?
17            A.    I had previously spoke with Open Road
18       Paving, yes, sir.
19            Q.    And what, when you spoke with Open Road
20       Paving, what was the nature of the concern that they
21       had with Alex?
22            A.    Just his, just his treatment of them, how
23       he got along with their foreman, the things that he,
24       the things that he would bring up, the things that
```

Page 15

EXHIBIT 4

1    occurred in the past, he would just never let them

2    die.

3         Q.    What you mean would never let them die?

4         A.    I don't recall the year there was an

5    accident on one of Alex' paving jobs on I-74.  Open

6    Road Paving was the contractor.  Anytime there was

7    any traffic control issue, Alex would always bring

8    up this accident that occurred in the late nineties,

9    early 2000s.

10        Q.    That seems to me like he's bringing up

11   safety concerns?

12        A.    There's a way to do that.

13        Q.    So, it's okay to bring up safety concerns,

14   it's just a way that you should go about doing it?

15        A.    Yes.

16        Q.    And you're saying Alex' way of addressing

17   safety concerns was flawed because he referenced

18   previous safety issues?

19        A.    You can't tell somebody that you killed

20   somebody because of your lack of safety.

21        Q.    Why can't you?

22        A.    I don't think that it was proven in court.

23        Q.    Well, there are a lot of things that

24   aren't proven in court that people say.  I mean, if

Page 16

1  Alex has a concern about their safety, are you
2  saying that it's not appropriate for him to address
3  issues of previous concerns?
4       A.   At what point do you let it die?  Do you
5  still bring that up 15 years later?
6       Q.   Well, I don't know, it seems as though
7  from your answer you think that no, you don't, you
8  drop it.  Is that right?
9       A.   I'm just saying there's a way to do that
10  in a professional manner.
11       Q.   And you're saying Alex' manner, in which
12  he did it, was unprofessional?
13       A.   That is what I'm saying.  Yes, sir.
14       Q.   And what he did was, he would bring it up
15  multiple times over the years and that was the
16  unprofessional way, or was there something else
17  unprofessional about the way that Alex brought it
18  up?
19       A.   Multiple times over the years, multiple
20  times maybe during a conversation about something.
21       Q.   Was somebody killed in that accident?
22       A.   I can't -- I can't recall.  I wasn't in
23  construction at that time.
24       Q.   Okay.  So, did you think that Alex was

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
1    really not capable of performing his job duties?
2         A.   I felt that there was an issue in the fact
3    that he had issues with getting along with staff.
4         Q.   Okay.
5         A.   There was the common denominator seemed to
6    be Mr. Kedas.  It made no difference who we put with
7    him, rotate different staff in and out with him, he
8    seemed to have an issue with them.
9         Q.   So, why send him for a fitness review
10   evaluation?  I mean, did you think -- because he was
11   sent for a psychiatric evaluation, right?
12        A.   To my understanding, yes, sir.  Yes.
13        Q.   So, so, I mean why do that if somebody is
14   not getting along with somebody?  Why would you send
15   them for a psychiatric evaluation?
16        A.   When you try to do the progressive
17   discipline, and it doesn't get any better, we're
18   trying to figure out what the problem is.
19        Q.   So, had you attempted progressive
20   discipline with him before the fitness review
21   evaluation?
22        A.   Yes, sir.
23        Q.   Had he ever been suspended?
24        A.   No, sir.
```

Page 18

1        Q.    And when you would attempt to discipline

2    him, he would respond to that in writing, correct?

3        A.    Yes, sir.

4        Q.    Did you dislike the fact that he responded

5    in writing?

6        A.    No, sir.

7        Q.    Now, the next issue you raised, after the

8    arguing with Mr. Carnahan, was bookkeeping issues

9    with Andrea Childers.  What was that about?

10        A.    Where Miss Childers was a bookkeeper for

11    Mr. Kedas.  Mr. Kedas wanted to do something that

12    Miss Childers did not feel was correct, and she

13    would not do it.

14        Q.    What was that?

15        A.    I don't recall.  I'd have to look it up.

16    I have a documentation for it.

17        Q.    So, what was -- I'm sorry, I interrupted

18    you.  Go ahead, sir.

19        A.    It was a paying for a pay item or

20    something of that matter.

21        Q.    So, how was that issue resolved?

22        A.    We had a meeting to discuss the matter,

23    and then we got to a point that we moved

24    Miss Childers.

Atkinson-Baker, A Veritext Company
(818) 551-7300                          www.veritext.com

1          Q.    And when was Miss Childers moved?

2          A.    I would have to look and see, sir.  I

3     don't recall off the top of my head.

4          Q.    Let me ask you this; do you recall if that

5     was before or after the fitness review evaluation?

6          A.    I do not recall, sir.

7          Q.    Do you recall Mr. Kedas lodging complaints

8     that Miss Childers was getting preferential

9     treatment?

10          A.    Yes, sir.

11          Q.    And he raised that -- well, who did he

12     raise that with, to your knowledge?

13          A.    He raised it with the field engineer,

14     Mr. Carnahan, and he also raised it with

15     Mr. Crawford.

16          Q.    Do you recall if he raised it with

17     somebody outside of the district?

18          A.    To my knowledge, if I remember correctly,

19     he also elevated it and sent it to, I believe, the

20     Bureau of Investigations and Compliance, to BIT.

21          Q.    The internal entity for IDOT?

22          A.    Yes, sir.

23          Q.    And was that upsetting to you that he did

24     that?

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**EXHIBIT 4**

```
 1          A.    No, sir.
 2          Q.    Now, in June of 2016, you provided a
 3    counseling memorandum to Mr. Kedas, do you recall
 4    that?
 5          A.    Yes, sir.
 6          Q.    And that was dealing with a -- an email
 7    that he wrote on April 26th, 2016, regarding an
 8    ethics issue and a conflict of interest?
 9          A.    Yes, sir.
10          Q.    What do you recall about that?
11          A.    Honestly, as my memory recalls, there was
12    a question about job assignments.
13          Q.    He was complaining that he thought Andrea
14    Childers was getting favoritism from Mr. Carnahan,
15    is that right?
16          A.    That is correct.
17          Q.    And he have believed that there might be
18    something of a sexual nature related to that?
19          A.    That would be correct.
20          Q.    And you found that to be problematic?
21          A.    I found it to be problematic that he
22    questioned job assignments.
23          Q.    Why?
24          A.    Because Mr. Kedas had been counseled on
```

1    that previously in 2014, and it's management's right

2    to make job assignments.

3         Q.   Why can't an employee question why I

4    haven't, why something is going to somebody else,

5    why is that inappropriate?

6         A.   It's inappropriate when you think, per my

7    memo to Mr. Kedas concerning this matter, Mr. Kedas

8    was under the assumption that because at that point

9    in time he was the only senior resident engineer,

10   that he should receive the largest job, most complex

11   job in the district.  His job description does not

12   state that.

13        Q.   I understand what you're saying, but that

14   doesn't answer my question.  Why is it problematic

15   for him to express a concern about favoritism in job

16   assignments?

17        A.   How is it favoritism if management has a

18   right to make a decision?

19        Q.   I understand that management has a right

20   to make a decision, but are you saying the employee

21   doesn't have a right to even raise the question why

22   this decision was even made or to inquire about it?

23        A.   You can make, you can make, you can ask

24   all you want, I guess.  He did.

Atkinson-Baker, A Veritext Company
(818) 551-7300                          www.veritext.com

1      Q.   I know he did, and he was disciplined for

2   it, right?

3      A.   That's correct.

4      Q.   I mean, but, my question is; why, why is

5   it problematic for an employee to ask that question?

6      A.   I'm going to tell you, I'm going to again

7   refer to the union contract that is management's

8   rights to assign individuals.

9      Q.   No, I understand that the union contract

10   says, you know, that people can be assigned to

11   certain projects.  But it seems as though an

12   employee who doesn't understand why they aren't

13   being assigned a project should probably be

14   encouraged to ask, why am I not being assigned

15   something, am I wrong?

16      A.   You're not wrong, you're correct.

17      Q.   Do -- or did you at that time personally

18   like or dislike Mr. Kedas?

19      A.   I personally liked Mr. Kedas.

20      Q.   You also referenced issues that you, that

21   there were issues with Mr. Smith when he became

22   Mr. Kedas' supervisor.  What do you recall about

23   those issues?

24      A.   Mr. Kedas would question, question

Atkinson-Baker, A Veritext Company
(818) 551-7300                www.veritext.com

EXHIBIT 4

1   decisions that Mr. Smith -- would question

2   directives that Mr. Smith gives him.

3       Q.   Do you know an individual by the name of

4   Lugene Joines?

5       A.   Yes, sir.

6       Q.   And did she use to work for IDOT?

7       A.   Yes, sir.  Lugene was the Personnel

8   Service Manager for District 5.

9       Q.   Was she a subordinate of yours or was she

10  at District 5 but not subordinate?

11      A.   She was not subordinate.  She reported to

12  the District 5 administration.

13      Q.   And was her position sort of a human

14  resources type of position?

15      A.   Yes, sir.

16      Q.   And did you ever have discussions with her

17  about Mr. Kedas?

18      A.   Yes, sir.

19      Q.   And did you ever have concerns that HR was

20  not taking enough of a proactive stance as it

21  related to it to Mr. Kedas?

22      A.   No, sir.

23      Q.   So, you felt that the way that they

24  handled everything was appropriate?

Page 24

```
1            A.   Yes, sir.

2            Q.   Did you ever request that Mr. Kedas be

3    removed from the bureau?

4            A.   No, sir.

5            Q.   Did you ever request that Mr. Kedas be

6    terminated?

7            A.   No, sir.

8            MR. BAKER:  Taylor, I want to take about a

9    five minute break here, okay.

10                          (Short break after which the

11                          following proceedings were had.)

12   BY MR. BAKER:

13           Q.   I don't have anymore questions for you

14   Mr. Garnett.  Miss Traynoff might have some

15   questions for you.  It's her opportunity to ask

16   those now, so, I'll let her see if she has any.

17           MS. TRAYNOFF:  If I can take a moment

18   here.  I don't think that I do, but I just want to

19   take a quick moment here to look.

20                I don't have any questions for you,

21   Mr. Garnett.

22           MR. BAKER:  Okay.  Taylor, do you want to

23   explain the waiver or signature?

24           MS. TRAYNOFF:  Sure, Mr. Garnett, at this
```

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

1   point you can either waive your signature, which

2   means the court reporter will certify the

3   transcript, or, you can withhold your signature in

4   order to review the transcript of your deposition

5   testimony.  So, when you take this option, you're

6   given the ability to go line-by-line reviewing your

7   transcript and point out all the -- if there are any

8   inaccuracies in the transcription and those are not

9   substantive changes, such as changing a "no" answer

10  to a "yes."  It's just more of, maybe something was

11  misheard, like someone's name, or maybe someone's

12  gender or something like that.  And then at that

13  point you'll sign, you will see sign then, and

14  you'll get it back to me.  And the court reporter,

15  I'll give it to her, and she will certify the

16  transcript.

17          So, either you can withhold, excuse me,

18  you can certify now and not have the opportunity to

19  look over your transcript, or you can withhold that

20  signature and get the opportunity to review the

21  transcript.

22          THE WITNESS:  I would prefer to withhold

23  so that I can have a chance to look at the

24  transcript.

Atkinson-Baker, A Veritext Company
(818) 551-7300                          www.veritext.com

**EXHIBIT 4**

```
 1              MR. BAKER:  Thank you very much, I
 2    appreciate your testimony today and, you know, I
 3    just hope that everybody stays safe out there on the
 4    roads.  You've got a tough job to do on a day like
 5    today.  I hope all your people out there who are
 6    working hard to keep the roads safe are safe
 7    themselves.  So, thank you so much, sir, have a good
 8    afternoon.
 9              For our court reporter, I just want the
10    same order on all the transcripts.  Just the
11    regular-sized digital copy is good for me.
12              MS. TRAYNOFF:  And the same for me, that I
13    usually order, yeah.
14                        (Which were all the proceedings
15                        had in the above-entitled
16                        cause.)
17
18
19
20
21
22
23
24
```

Page 27

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                    URBANA DIVISION
 3
 4
 5   ALEX KEDAS,                       )
                                       )
 6            Plaintiff,               )
                                       )
 7               -v-                   )No. 19-cv-2113
                                       )
 8   ILLINOIS DEPARTMENT OF            )
     TRANSPORTATION.                   )
 9                                     )
              Defendant.               )
10
11
12
              I, Pamela C. Taylor, CSR/RPR of the State
13   of Illinois, do hereby certify that I reported in
     machine shorthand the proceedings had at the
14   deposition in the above-entitled cause, and that
     this transcript is a true and accurate transcription
15   of my machine shorthand notes so taken to the best
     of my ability.
16
17
18
     CSR #084-001184
19
20   Dated this 3rd day
21   of March, 2022
22
23
24
```

Page 28

```
 1                       SIGNATURE PAGE
 2            I, KENSIL GARNETT, have read the foregoing
      transcript of my deposition taken on February 17,
 3    2022, and, except for any corrections noted below,
      it is a true and correct transcript of my deposition
 4    given on the date aforesaid.
 5
 6                        CORRECTIONS BASED ON ERRORS
 7                        IN REPORTING OR TRANSCRIPTION
 8
 9
10
11
12
13
14
15            _____
16                        KENSIL GARNETT
17
18    STATE OF ILLINOIS  )
      COUNTY OF C O O K  )
19    SUBSCRIBED AND SWORN TO
      Before me this _____ day of
20    _____, A.D., 2022
21    _____
22            Notary Public
23
24
                                         Page  29
```

**EXHIBIT 4**

```
 1    MS. TAYLOR TRAYNOFF

 2    taylor.traynoff@ilag.gov

 3                                    March 3, 2022

 4    RE: ALEX KEDAS vs. ILLINOIS DEPARTMENT OF TRANSPORTATION

 5    2/17/2022, KENSIL GARNETT

 6    The above-referenced transcript has been

 7    completed by Veritext Legal Solutions and

 8    review of the transcript is being handled as follows:

 9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20    __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23    __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25
```

Page 30

1    _x_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, notating the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10        requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

**EXHIBIT 4**

```
1    ALEX KEDAS vs. ILLINOIS DEPARTMENT OF TRANSPORTATION

2    KENSIL GARNETT (#5090354)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   KENSIL GARNETT                        Date

25
```

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

**EXHIBIT 4**

**[& - busy]**

| & | |
| --- | --- |
| **&** | 2:3 30:23 31:9 |

**0**

**084-001184** 1:17 28:18

**1**

**1** 31:1
**12** 6:16
**13177** 28:18
**15** 17:5
**17** 1:11 29:2
**19** 1:6 28:7
**1991** 6:1
**1st** 9:2

**2**

**2/17/2022** 30:5
**2000s** 16:9
**2008** 10:3
**2014** 9:2 22:1
**2016** 21:2,7
**2022** 1:11 28:21 29:3,20 30:3
**2025.520** 30:9,12
**2113** 1:6 28:7
**217** 2:5,11
**26th** 21:7
**299** 7:22
**2:17** 1:12
**2nd** 2:10

**3**

**3** 6:4,13 8:23 9:1 30:3
**30** 31:1
**3rd** 28:20

**4**

**4** 3:7 6:15,16,22 7:9,20,22 8:2
**400** 7:22

**415** 2:4

**5**

**5** 6:15,17,22 7:20 7:21 8:1 9:5,7 24:8,10,12
**500** 2:10
**5090354** 32:2
**522-3445** 2:5

**6**

**62701** 2:4
**62704** 2:10

**7**

**7** 6:24
**700** 7:23
**74** 16:5
**782-1090** 2:11

**a**

**a.d.** 29:20
**ability** 26:6 28:15
**able** 13:7
**accept** 12:20
**accepting** 14:5
**accident** 16:5,8 17:21
**accurate** 4:21 5:8 28:14
**acronym** 11:16
**acting** 9:1
**address** 17:2
**addressing** 16:16
**administration** 24:12
**aforesaid** 29:4
**afternoon** 4:7 27:8
**agenda** 13:6
**ahead** 19:18
**alex** 1:4 4:8 9:9,19 9:21 10:1,2,14 11:3 12:5 13:7

14:9 15:21 16:5,7 16:16 17:1,11,17 17:24 28:5 30:4 32:1
**allow** 4:23
**andrea** 10:20 19:9 21:13
**answer** 5:2,5 17:7 22:14 26:9
**anymore** 25:13
**anytime** 16:6
**appearances** 2:1
**appeared** 2:6,12
**appearing** 30:18 31:7
**applied** 10:23
**appreciate** 27:2
**appropriate** 17:2 24:24
**approximately** 10:3
**april** 9:2 21:7
**area** 7:9
**arguing** 10:18 12:14 19:8
**arguments** 12:22 12:23 13:3,4 14:4
**arrange** 5:17
**asked** 5:10,10
**asking** 4:23
**assign** 23:8
**assigned** 23:10,13 23:14
**assignments** 21:12 21:22 22:2,16
**assistance** 15:7
**assistant** 2:9
**assumption** 22:8
**attempt** 19:1
**attempted** 18:19

**attorney** 2:8,9
**audibly** 5:5
**authorizations** 11:23

**b**

**b** 31:1
**back** 26:14
**background** 6:9
**baker** 2:3,3,3 3:7 4:6,8 25:8,12,22 27:1
**based** 29:6
**bathroom** 5:15
**bbbklegal.com** 2:5
**began** 9:24 10:2 13:9
**behalf** 2:6,12
**believe** 20:19
**believed** 12:6 21:17
**berate** 13:9
**best** 28:15
**better** 18:17
**bit** 20:20
**bloomington** 7:10
**body** 11:17
**bookkeeper** 19:10
**bookkeepers** 11:9
**bookkeeping** 10:5 10:19 19:8
**break** 5:15,16 25:9 25:10
**bring** 15:24 16:7 16:13 17:5,14
**bringing** 16:10
**brought** 4:9 17:17
**built** 6:20
**bureau** 20:20 25:3
**busy** 5:14 7:5,12

**[c - duly]**

| c | | | |
|---|---|---|---|
| **c** 1:17 6:5 28:12 29:18 | **complaining** 21:13 | **correctly** 11:4 20:18 | **deposed** 4:2 |
| **ca** 30:9,12,20 | **complaints** 20:7 | **counsel** 30:18,21 31:7 | **deposition** 1:11 4:15 26:4 28:14 29:2,3 30:19,22,24 31:8,10 |
| **call** 7:15 | **completed** 30:7,17 31:6 | **counseled** 21:24 | |
| **called** 1:14 | **completion** 31:10 | **counseling** 21:3 | **depositions** 1:16 4:19 |
| **capable** 18:1 | **complex** 22:10 | **count** 7:21 | |
| **carnahan** 10:19 12:15,21,24 13:1,8 13:8,9 19:8 20:14 21:14 | **compliance** 20:20 | **counties** 6:17,18 | **description** 22:11 |
| | **concern** 12:5 15:20 17:1 22:15 | **county** 29:18 | **determined** 30:18 30:22 31:7 |
| | **concerning** 10:5 22:7 | **court** 1:1 4:20 16:22,24 26:2,14 27:9 28:1 | **diary** 11:21 |
| **cause** 27:16 28:14 | | | **die** 16:2,3 17:4 |
| **ccp** 30:9,12 | **concerns** 10:1,2 13:7,10 16:11,13 16:17 17:3 24:19 | **coworkers** 9:22 | **difference** 18:6 |
| **ce** 6:4,5,24 | | **crawford** 20:15 | **different** 18:7 |
| **central** 1:1 7:7 14:24 28:1 | **conference** 1:19 | **criticism** 12:20 | **digital** 27:11 |
| | **conflict** 21:8 | **csr** 1:17 28:12,18 | **direction** 13:23,24 14:2,3 |
| **certain** 10:15 12:8 23:11 | **consists** 6:16,17 | **current** 6:2,4 | |
| | **construction** 6:19 9:8,17,18 10:9,11 11:22,24 17:23 | **currently** 5:19 | **directives** 24:2 |
| **certainly** 5:17 7:13 | | **cv** 1:6 28:7 | **directly** 7:1 |
| | | | **director** 8:21 |
| **certify** 26:2,15,18 28:13 | **contact** 30:9 | d | **discipline** 18:17 18:20 19:1 |
| | **contract** 23:7,9 | **d** 3:1 | |
| **champaign** 6:11 7:11 | **contractor** 16:6 | **daily** 11:20 | **disciplined** 23:1 |
| | **contractors** 14:6,7 14:14,15,19,22 15:9 | **database** 11:18 | **discovery** 1:16 |
| **chance** 26:23 | | **date** 29:4 30:16 31:5 32:24 | **discuss** 19:22 |
| **change** 32:4,7,10 32:13,16,19 | **control** 16:7 | | **discussions** 24:16 |
| | **conversation** 17:20 | **dated** 28:20 | **dislike** 19:4 23:18 |
| **changes** 26:9 | | **day** 7:5,6,12 8:15 27:4 28:20 29:19 | **disrupt** 7:14 |
| **changing** 26:9 | **conversations** 14:19 | | **district** 1:1,1 6:16 6:17 7:9,20,20,21 7:21,22 8:1,2 9:5 9:7 20:17 22:11 24:8,10,12 28:1,1 |
| **childers** 10:20 19:9,10,12,24 20:1 20:8 21:14 | | **days** 8:10,14,18,18 | |
| | **coordinator** 15:6 | **dealing** 21:6 | |
| | **copy** 27:11 | **decision** 22:18,20 22:22 | |
| **civil** 6:7 30:19,20 | **correct** 8:3 9:15 9:16 11:5 12:9,11 13:22 19:2,12 21:16,19 23:3,16 29:3 | **decisions** 24:1 | |
| **clarify** 5:11 | | **defendant** 1:8 2:12 28:9 | **districts** 6:15,22 |
| **close** 7:22 | | | **division** 1:2 28:2 |
| **code** 30:9,12,19,20 | | **degree** 6:10 | **documentation** 10:11 19:16 |
| **comes** 14:24 | **corrections** 29:3,6 30:14,15 31:3,4 | **denominator** 18:5 | |
| **commissioned** 1:18 | | **department** 1:7 4:10 5:20 7:14 10:5 11:10 28:8 30:4 32:1 | **doing** 16:14 |
| | | | **drop** 17:8 |
| **common** 18:5 | | | **duly** 4:2 |

Atkinson-Baker, A Veritext Company
(818) 551-7300                    www.veritext.com

[duties - interest]

| | | | |
|---|---|---|---|
| **duties** 9:21 18:1 | **examination** 3:3 | **frcp** 31:1 | **hope** 27:3,5 |
| **duty** 14:13 | 4:4 | **friday** 8:13 | **hr** 24:19 |
| **e** | **excavating** 15:11 | **full** 4:11 | **human** 24:13 |
| | **excavation** 15:13 | **g** | **i** |
| **e** 3:1 4:12,13 6:6 | **excuse** 26:17 | | |
| 30:9,12 31:1 32:3 | **exhibits** 3:11 | **g** 4:13 | **icors** 10:5,8,14 |
| 32:3,3 | **explain** 9:24 11:14 | **garnett** 1:11 3:4 | 11:5,15 |
| **eap** 15:6,7 | 25:23 | 4:1,12,14 25:14,21 | **identified** 15:12 |
| **earlier** 7:9 | **express** 22:15 | 25:24 29:2,16 | **idot** 5:24 6:1,3 9:4 |
| **early** 16:9 | **external** 11:16 | 30:5 32:2,24 | 20:21 24:6 |
| **eastern** 7:7 | **f** | **gender** 26:12 | **idrs** 11:22 |
| **either** 26:1,17 | | **general** 2:8,9 | **ilag.gov** 2:11 30:2 |
| **elevated** 20:19 | **fact** 11:6 18:2 19:4 | **generally** 8:10,12 | **illinois** 1:1,7,19 |
| **email** 21:6 | **familiar** 11:15 | **getting** 18:3,14 | 2:4,8,10 4:9 5:20 |
| **emails** 7:8 | **favoritism** 21:14 | 20:8 21:14 | 6:11 7:7,14 10:9 |
| **employed** 5:20,23 | 22:15,17 | **give** 26:15 | 28:1,8,13 29:18 |
| **employee** 15:7 | **february** 1:11 | **given** 12:7 26:6 | 30:4 32:1 |
| 22:3,20 23:5,12 | 29:2 | 29:4 | **immediate** 8:20,21 |
| **employees** 14:6 | **federal** 31:1,8,9 | **gives** 24:2 | 9:9,11,14 |
| **encouraged** 23:14 | **feel** 11:6 19:12 | **go** 13:7,10 16:14 | **implementation** |
| **engaged** 9:22 | **felt** 18:2 24:23 | 19:18 26:6 | 9:6,7 |
| **engineer** 6:4,7,13 | **field** 9:17,18,19 | **goes** 6:19 | **important** 7:17 |
| 6:24 8:24 9:1,6,7 | 10:18 12:14 14:5 | **going** 5:13,15 7:6 | **inaccuracies** 26:8 |
| 9:8,17,19 10:18 | 20:13 | 22:4 23:6,6 | **inappropriate** |
| 11:19 12:14 14:5 | **figure** 18:18 | **good** 4:7 27:7,11 | 22:5,6 |
| 20:13 22:9 | **filed** 10:4,4 11:10 | **grievance** 10:4 | **incident** 13:18 |
| **engineering** 6:8,12 | 12:6,10 | 11:10,12 12:5,10 | **included** 30:14 |
| **engineers** 9:17,18 | **find** 13:15 | **grievances** 10:3 | 31:3 |
| **entitled** 27:15 | **first** 4:2 9:24 | **guess** 22:24 | **indicated** 12:13 |
| 28:14 | 12:15 | **h** | **individual** 24:3 |
| **entity** 20:21 | **fit** 14:12 | | **individuals** 7:23 |
| **errata** 30:14,16 | **fitness** 13:21 14:23 | **h** 32:3 | 10:16 11:7,8,8 |
| 31:3,5 | 18:9,20 20:5 | **handled** 24:24 | 23:8 |
| **errors** 29:6 | **five** 25:9 | 30:8 | **information** 12:2 |
| **estimates** 11:23 | **flawed** 16:17 | **hard** 27:6 | 12:3 13:15 |
| **ethics** 21:8 | **follow** 4:19 | **head** 5:6 7:21 20:3 | **initial** 4:13 |
| **evaluation** 13:21 | **following** 25:11 | **headquartered** | **inquire** 22:22 |
| 18:10,11,15,21 | **follows** 4:3 30:8 | 8:1,2 | **instances** 14:11 |
| 20:5 | **foregoing** 29:2 | **highways** 8:22 | **instruction** 12:21 |
| **everybody** 7:17 | **foreman** 15:23 | **hold** 6:3 9:3 15:5 | **interactions** 9:22 |
| 27:3 | **found** 21:20,21 | **honestly** 21:11 | **interest** 21:8 |

Page 3

[internal - okay]

**internal** 20:21
**interrupted** 19:17
**interrupting** 13:11
**investigations**
 20:20
**issue** 10:7,12,14
 10:19 11:6 13:5
 16:7 18:2,8 19:7
 19:21 21:8
**issues** 9:20 10:17
 10:18,20,20 12:13
 12:19 14:4,5,6,8
 14:20 16:18 17:3
 18:3 19:8 23:20
 23:21,23
**item** 19:19
**ix** 6:4,5

**j**

**jab** 2:5
**jason** 10:21
**job** 6:14 9:21
 11:21 18:1 21:12
 21:22 22:2,10,11
 22:11,15 27:4
**jobs** 6:19 10:10
 16:5
**john** 2:3 4:8
**joines** 24:4
**june** 21:2

**k**

**k** 4:12 29:18
**kedas** 1:4 4:8 9:9
 10:4 12:20 13:10
 13:20 14:20 18:6
 19:11,11 20:7
 21:3,24 22:7,7
 23:18,19,22,24
 24:17,21 25:2,5
 28:5 30:4 32:1

**keep** 4:21 5:7
 11:21 12:2 27:6
**keeping** 10:10,10
 11:24
**kensil** 1:11 3:4 4:1
 4:12 29:2,16 30:5
 32:2,24
**kept** 13:10
**killed** 16:19 17:21
**know** 4:22 5:2,11
 5:13,16 7:16,18
 8:12 11:15 13:6
 17:6 23:1,10 24:3
 27:2
**knowledge** 20:12
 20:18
**krajewski** 2:3
**kwame** 2:8

**l**

**l** 4:12
**lack** 16:20
**largest** 22:10
**late** 16:8
**lawsuit** 4:9
**legal** 30:7
**license** 1:17 6:12
**liked** 23:19
**line** 26:6,6 30:15
 31:4 32:4,7,10,13
 32:16,19
**list** 13:10
**listened** 13:8
**locations** 8:5
**locked** 30:12 31:1
**lodging** 20:7
**log** 12:2
**long** 4:16 5:14,23
 8:23
**look** 19:15 20:2
 25:19 26:19,23

**looking** 7:23
**lot** 7:8 16:23
**lugene** 24:4,7

**m**

**machine** 28:13,15
**maintained** 6:20
**making** 6:18 7:11
 7:16
**malek** 15:4
**management**
 10:10 22:17,19
**management's**
 22:1 23:7
**manager** 24:8
**manner** 17:10,11
**march** 28:21 30:3
**marie** 15:4
**matter** 19:20,22
 22:7
**mean** 10:13 16:3
 16:24 18:10,13
 23:4
**means** 26:2
**meeting** 13:5,5
 19:22
**meetings** 8:15
**memo** 22:7
**memorandum**
 21:3
**memory** 4:18
 21:11
**mentioned** 10:23
 11:3
**middle** 4:13
**minute** 25:9
**misheard** 26:11
**misunderstood**
 11:1
**moment** 25:17,19
**monday** 8:12,12
 8:13

**morning** 7:10
**moved** 19:23 20:1
**multiple** 17:15,19
 17:19

**n**

**n** 3:1 4:12,13
**name** 4:8,11,13
 8:19 24:3 26:11
**nature** 8:16 10:6
 15:20 21:18
**necessarily** 8:19
**necessary** 30:14
 31:3
**need** 5:15,16 7:15
 7:18
**needed** 14:21
**never** 9:11 16:1,3
**nineties** 16:8
**nod** 5:6
**normal** 7:10
**notary** 1:18 29:22
**notating** 30:15
 31:4
**noted** 29:3
**notes** 11:1 28:15
**number** 30:15
 31:4

**o**

**o** 29:18,18
**observe** 12:23
 13:2,4
**occasion** 13:4
**occurred** 13:12
 16:1,8
**office** 8:4,6,7
 14:24 30:11
**okay** 4:17 5:3,5,17
 5:19 7:2 9:24 10:8
 10:22 14:1,11
 16:13 17:24 18:4

Page 4

**[okay - requested]**

25:9,22
**open** 15:11,12,17
  15:19 16:5
**operations** 6:22,24
  7:14
**opportunity** 25:15
  26:18,20
**opposed** 5:6
**option** 26:5
**order** 14:12 26:4
  27:10,13
**original** 30:10,21
**outside** 20:17
**oversee** 7:20

**p**

**p.m.** 1:12
**page** 29:1 30:15
  31:4 32:4,7,10,13
  32:16,19
**pages** 30:14,17,17
  31:3,6,6
**pamela** 1:17 28:12
**paris** 8:1,7,14,18
**particular** 12:19
  13:17
**paving** 15:11,12
  15:18,20 16:5,6
**pay** 11:23 19:19
**paying** 19:19
**pdf** 30:12 31:1
**penalty** 30:16 31:5
**people** 7:19 10:24
  12:7 16:24 23:10
  27:5
**peoria** 6:16 7:9 8:2
  8:6,11,11,18
**percentage** 8:8
**performed** 9:21
**performing** 18:1
**period** 30:18 31:7

**perjury** 30:17
  31:6
**permissions** 11:7
  11:9 12:7
**personally** 9:20
  14:8 23:17,19
**personnel** 24:7
**pertaining** 1:15
**physical** 8:4,6,7
**physically** 7:24
**plaintiff** 1:5,14 2:6
  28:6
**please** 4:10 7:16
  7:18
**point** 5:1 12:22
  13:20 17:4 19:23
  22:8 26:1,7,13
**position** 6:2 7:1
  9:3 15:5 24:13,14
**possible** 7:6
**prefer** 26:22
**preferential** 20:8
**prepared** 13:6
**present** 13:14,17
**previous** 16:18
  17:3
**previously** 15:15
  15:17 22:1
**prior** 9:5,6
**proactive** 24:20
**probably** 5:10
  23:13
**problem** 18:18
**problematic** 21:20
  21:21 22:14 23:5
**procedure** 30:19
  30:20
**proceedings** 25:11
  27:14 28:13
**professional** 6:12
  17:10

**program** 6:19
  11:18 15:7
**progressive** 18:16
  18:19
**project** 23:13
**projects** 10:11
  23:11
**proven** 16:22,24
**provided** 21:2
  30:19 31:8
**psychiatric** 18:11
  18:15
**public** 1:18 29:22
**purpose** 1:16
**put** 18:6

**q**

**qualified** 1:18
**question** 4:23 5:2
  5:12 21:12 22:3
  22:14,21 23:4,5,24
  23:24 24:1
**questioned** 21:22
**questions** 5:5
  25:13,15,20
**quick** 25:19
**quickly** 11:2

**r**

**r** 4:13 32:3,3
**r&s** 31:1,9
**raise** 20:12 22:21
**raised** 19:7 20:11
  20:13,14,16
**raoul** 2:8
**reached** 15:10
**read** 29:2
**reading** 30:23
  31:9
**really** 18:1
**reason** 32:6,9,12
  32:15,18,21

**recall** 13:12 15:2,9
  16:4 17:22 19:15
  20:3,4,6,7,16 21:3
  21:10 23:22
**recalls** 21:11
**receive** 14:16
  22:10
**received** 7:8 14:14
  14:18
**recognize** 5:14
**record** 4:21 5:8
  10:10 11:24
**records** 11:22
**refer** 23:7
**referenced** 12:16
  16:17 23:20 30:6
**referred** 13:21
**refresh** 4:17
**regarding** 21:7
**region** 6:4,13 8:23
  9:1
**regular** 27:11
**related** 21:18
  24:21
**released** 30:21
**remember** 12:18
  20:18
**removal** 6:23 7:3
**removed** 25:3
**report** 7:1
**reported** 9:14,18
  9:19 24:11 28:13
**reporter** 4:20 26:2
  26:14 27:9
**reporting** 29:7
**reports** 7:1
**represent** 4:8
**request** 13:16 25:2
  25:5
**requested** 14:12
  14:16,18 31:1,9,10

Atkinson-Baker, A Veritext Company
(818) 551-7300      www.veritext.com

[resident - thursday]

resident 11:19,19
22:9
resolved 19:21
resources 24:14
respond 4:24 19:2
responded 19:4
responsibilities
6:14
responsibility
6:21
responsible 6:15
6:18
return 30:17 31:6
review 13:21 18:9
18:20 20:5 26:4
26:20 30:8,10,13
31:2
reviewing 26:6
right 4:7,17 17:8
18:11 21:15 22:1
22:18,19,21 23:2
rights 23:8
road 15:11,12,17
15:19 16:6
roads 6:20 27:4,6
robinson 15:4
rotate 18:7
rpr 1:17 28:12
rules 4:18 31:8

**s**

s 2:4,10 4:12 32:3
safe 7:17 27:3,6,6
safety 16:11,13,17
16:18,20 17:1
sat 13:8
saying 16:16 17:2
17:9,11,13 22:13
22:20
says 23:10
schedule 30:10

see 20:2 25:16
26:13
send 18:9,14
senior 22:9
sent 18:11 20:19
service 24:8
seven 6:17
seventh 2:4
sexual 21:18
short 25:10
shorthand 28:13
28:15
shoulders 5:7
shrug 5:6
sign 26:13,13
30:16 31:5
signature 25:23
26:1,3,20 28:18
29:1 30:21,23,23
31:9
singled 10:16,23
11:4
sir 4:7,7,16 5:4,18
5:22 6:10 7:4 9:12
9:16,23 11:5,13
12:4,12,17 13:13
13:19,24 14:10
15:8,14,18 17:13
18:12,22,24 19:3,6
19:18 20:2,6,10,22
21:1,5,9 24:5,7,15
24:18,22 25:1,4,7
27:7
sized 27:11
smith 10:21 23:21
24:1,2
snow 6:22 7:2
software 12:1
solutions 30:7
somebody 16:19
16:20 17:21 18:13

18:14 20:17 22:4
someone's 26:11
26:11
sorry 19:17
sort 6:9 11:17 13:6
24:13
speak 14:7
specifically 10:13
15:2
spend 8:9,10,14
spoke 15:17,19
spoken 15:15
springfield 2:4,10
8:16 15:1
staff 18:3,7
stance 24:20
stand 6:6
stark 15:11,13
start 8:11
started 7:9
state 1:19 4:11
22:12 28:12 29:18
30:9,12
statements 14:13
14:14,22
states 1:1 28:1
statewide 15:6
status 10:15
stays 27:3
step 7:18
stipulation 30:20
stood 11:16
street 2:4,10
subordinate 24:9
24:10,11
subordinates 9:13
subpoena 1:15
subscribed 29:19
substantive 26:9
supervision 9:10
9:12,14 14:5

supervisor 8:20,21
23:22
sure 5:2,11 6:19
7:16 25:24
suspended 18:23
sworn 4:2 29:19
system 11:24
systems 10:10

**t**

t 4:13,13 32:3,3
take 5:13,16 6:8
7:15 11:1,2 25:8
25:17,19 26:5
taken 1:19 4:15
28:15 29:2
taylor 1:17 2:9
25:8,22 28:12
30:1
taylor.traynoff
2:11 30:2
technician 11:20
tell 14:11 16:19
23:6
term 6:5
terminated 25:6
testified 4:2
testimony 26:5
27:2
thank 27:1,7
thing 10:17
things 5:15 8:16
10:6 11:23 12:8
15:23,24,24 16:23
think 16:22 17:7
17:24 18:10 22:6
25:18
thought 10:15
21:13
three 8:18
thursday 8:12

Page 6

EXHIBIT 4

[time - zoom]

**time** 4:16 5:1 8:8 8:17 13:20 17:23 22:9 23:17 30:10 30:18,24 31:7
**times** 17:15,19,20
**title** 8:20
**today** 4:22 7:5 27:2,5
**told** 11:15 12:24 13:1 14:8,21 15:2
**top** 20:3
**total** 7:19
**tough** 27:4
**traffic** 16:7
**transcript** 26:3,4,7 26:16,19,21,24 28:14 29:2,3 30:6 30:8,10,13,13,21 31:2,2
**transcription** 26:8 28:14 29:7
**transcripts** 27:10
**transportation** 1:7 4:10 5:21 7:15 28:8 30:4 32:1
**traynoff** 2:9 25:14 25:17,24 27:12 30:1
**treatment** 15:22 20:9
**true** 28:14 29:3
**try** 4:24 8:13 18:16
**trying** 4:21 11:1 18:18
**two** 8:10,14,18
**type** 11:20 24:14

**u**

**understand** 5:9,19 8:1 12:1 22:13,19 23:9,12

**understanding** 11:4 18:12
**union** 11:12 12:10 23:7,9
**united** 1:1 28:1
**university** 6:11
**unprofessional** 17:12,16,17
**upsetting** 20:23
**urbana** 1:2 6:11 28:2
**use** 24:6
**usually** 27:13

**v**

**v** 1:6 28:7
**veritext** 30:7,9,11
**vs** 30:4 32:1

**w**

**waive** 26:1
**waived** 30:23,23
**waiver** 25:23
**waiving** 30:20
**want** 7:13 22:24 25:8,18,22 27:9
**wanted** 14:22 19:11
**way** 4:24 7:11,18 9:21 16:12,14,16 17:9,16,17 24:23
**wednesday** 8:13
**week** 8:10,11,14
**wise** 8:19,20
**withhold** 26:3,17 26:19,22
**witness** 1:14 3:3 26:22 30:13,16 31:2,5
**work** 7:24 24:6
**worked** 6:1

**working** 27:6
**worst** 7:6
**writing** 19:2,5
**wrong** 23:15,16
**wrote** 21:7

**x**

**x** 3:1 31:1

**y**

**yeah** 27:13
**year** 8:17 10:7,13 16:4
**years** 17:5,15,19

**z**

**zoom** 1:19

Atkinson-Baker, A Veritext Company
(818) 551-7300  www.veritext.com

**EXHIBIT 4**

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions

**Ukipkpi"cpf"Hknkpi"Fgrqukvkqpu**

(a) Submission to Deponent; Changes; Signing.
Unless signature is waived by the deponent, the
officer shall instruct the deponent that if the
testimony is transcribed the deponent will be
afforded an opportunity to examine the deposition
at the office of the officer or reporter, or
elsewhere, by reasonable arrangement at the
deponent's expense, and that corrections based on
errors in reporting or transcription which the
deponent desires to make will be entered upon the
deposition with a statement by the deponent that
the reporter erred in reporting or transcribing the
answer or answers involved. The deponent may not
otherwise change either the form or substance of
his or her answers. The deponent shall provide the
officer with an electronic or physical address to
which notice is to be sent when the transcript is
available for examination and signing. When the
deposition is fully transcribed, the officer shall
deliver to the deponent, at the address supplied,

**EXHIBIT 4**

notice that it is available and may be examined at a stated place at stated times, or pursuant to arrangement. After the deponent has examined the deposition, the officer shall enter upon it any changes the deponent desires to make, with the reasons the deponent gives for making them. If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. The deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing.

(1)If the testimony is transcribed, the officer

**EXHIBIT 4**

shall certify within the deposition transcript that
the deponent was duly sworn by the officer and that
the deposition is a true record of the testimony
given by the deponent.  A deposition so certified
requires no further proof of authenticity
(2) Deposition transcripts shall not be filed with
the clerk of the court as a matter of course.  The
party filing a deposition shall promptly serve
notice thereof on the other parties and shall
file the transcript and any exhibits in the
form and manner specified by local rule.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 4**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.